Filed 6/2/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S052374 |
| v. | ) | |
| | ) | |
| STEVEN ALLEN BROWN, | ) | |
| | ) | Tulare County |
| Defendant and Appellant. | ) | Super. Ct. No. 32842 |
| _____ | ) | |

A jury convicted Steven Allen Brown of first degree murder, sodomy, and forcible lewd act on a minor under 14.[1]  It found true the special circumstances for murder in the commission of the sexual offenses,[2] and returned a death verdict.  This appeal is automatic.  (Cal. Const., art. 6, § 11, subd. (a); Pen. Code, § 1239, subd. (b).)  We affirm the judgment.

---

[1]  Penal Code sections 187, subdivision (a), 189, 286, subdivision (c), and 288, subdivision (b)(1).

[2]  Penal Code section 190.2, subdivision (a)(17)(D), (E).  The jury acquitted defendant of rape (Pen. Code, § 261, subd. (a)(2)) and found not true the rape-murder special circumstance (Pen. Code, § 190.2, subd. (a)(17)(C)).

1

I.  FACTS

A.  Guilt Phase

1.  Prosecution

The body of 11-year-old April Holley was found in the bathtub of the trailer home she shared with her mother Naomi and her older sister Tammy.[3]  April had been sexually assaulted and drowned.  Defendant was linked to the crimes primarily by statements attributable to him.  At trial, he denied his involvement and offered a partial alibi defense. The time of April's death was an important question.  In addition to a pathologist's estimate, the prosecution offered the testimony of a number of witnesses to establish when the crime occurred.

The Holleys' trailer was located in an area on the outskirts of Tulare called the Matheny Tract (the Tract).  The trailer's front door was generally secured by a padlock when the family was away, but the back door was often left open.  The weekend of April's death, December 2-4, 1988, was cold and foggy around Tulare.  April was to spend the weekend in town with family friends Melody Lewis, Richard Schnabel, and their six children.  April would occasionally stay with them, do chores, and babysit.

After dropping April off at the house, her mother Naomi had time to herself.  She spent the night of Friday, December 2, at a friend's home.  At some point on Saturday afternoon, Naomi went by the trailer, then left for a Tupperware party in Porterville.  She stayed there that night rather than drive back in the heavy fog.  She returned home on Sunday afternoon, after April's body had been discovered.  When Naomi left on Saturday, the trailer's front door was padlocked.  The back door was unlocked and the television was off.

---

[3]     Because the Holley family share a common surname, we refer to them by their given names.

2

Meanwhile, on Saturday afternoon, there was a dispute at the Lewis/Schnabel home. Lewis drove April back to the trailer, but Naomi was not there and could not be located. Lewis then drove April back to their house in Tulare. On Saturday evening, Lewis and Schnabel went out, leaving their teenage daughters, Shannon and Teresa, to watch April and the younger children. The adults returned about 10:00 p.m.

Following her return to the Lewis/Schnabel home, April made several phone calls and asked to be driven back to the trailer. She gave the impression that she had spoken with her mother, who was now back at the trailer. The older girls drove April home, leaving between 7:00 and 8:00 p.m. The fog-shrouded drive took 15 to 30 minutes. When they arrived, Teresa saw the television flickering through the window. The front door was locked, so April walked toward the back, stopping to wave to Shannon and Teresa. April was last seen wearing a Betty Boop T-shirt and black jeans.

Lisa Matthews (Lisa) was April's best friend and lived in the Tract with her grandmother. That Saturday, April called between 7:30 and 8:00 p.m. and asked if Lisa could spend the night. Lisa said she would ask permission and hung up. Lisa's grandmother refused the request but, when April called back 20 minutes later, Lisa said she would meet her at the trailer. Although Lisa began to walk over, she turned back because it was too cold and foggy. Lisa did not see April that night but went to the trailer at 7:00 a.m. on Sunday. The front door was padlocked but the television was on.

Lorraine Hughes rented a trailer in the Tract and was a friend of the Holleys. April would come over often to use her phone. Between 7:45 and 8:00 p.m. on Saturday, April came to her door. Hughes did not answer, however, and saw April walk back toward the Holley trailer.

Several witnesses reported hearing a gunshot and screaming in the area of the trailer that Saturday night. Relevant time estimates varied from 8:00 to 9:45 p.m. The Holleys' next-door neighbor saw a car pull into their driveway between 8:25 and 8:30. She had previously estimated the time to be about 8:00.

3

April's body was discovered Sunday afternoon by Orville Bailey and Roger Rummerfield (Roger). The men were working nearby and Roger went to the trailer to use the restroom. The front door was locked and the television was "blaring loud." Finding the back door partially open, he walked to the bathroom and found April lying in the bathtub. She was on her side in a fetal position, in one to two inches of water. The drain had been plugged with a rag. April had no pulse. Roger ran outside. He eventually kicked down the front door while Bailey went around the neighborhood looking for a phone to call an ambulance. Bailey went inside and saw April's body.

Before law enforcement arrived, several neighbors entered the trailer. None saw blood or signs of injury. Responding medical and police personnel moved April's body to the kitchen and saw blood coming from her rectum.

Pathologist Dr. Gary Walter examined April's body at the scene, and noted signs of rigor mortis. These signs can begin to present within three to four hours of death. The process peaks within 12 to 36 hours, depending on variables including body temperature and muscle mass. The condition of April's body was consistent with death occurring at about 9:00 p.m. on Saturday. Walter conceded that estimate was not conclusive, and such estimates were most accurate when made within four or five hours of death.

Dr. John McCann, a pediatrician specializing in child sexual abuse, and pathologist Dr. Leonard Miller performed April's autopsy. She suffered no gunshot injury. There were signs of petechiae, small hemorrhages caused by ruptured blood vessels. Petechiae do not form after death. April had petechiae on her head, neck, and eyes consistent with struggling or being held down by a hand. The pattern was not consistent with strangulation that would cause unconsciousness by itself. A bruise on her earlobe indicated infliction of a blow. One bruise on her inner thigh was caused within 24 hours, but other bruises on her legs were at least two to three days old. April had a vaginal laceration unusual in its length and width. It was a serious and violent injury consistent with penetration by a penis or larger object, inflicted while she was lying on

4

her back. She also had a blood blister on her hymen consistent with blunt force trauma. April's anus was dilated and irregular, with lacerations reflecting forcible penetration by a penis or other object. Her injuries were consistent with multiple assailants. On cross-examination, Dr. McCann conceded that the lack of injuries to her lower body was also consistent with her being rendered unconscious at some point. It was possible, though less likely in McCann's opinion, that April's injuries had been caused by a single assailant.

Dr. Miller agreed that April's injuries suggested a struggle. The pattern of petechiae was inconsistent with ligature strangulation. April died by drowning. Her lungs showed signs of active water inhalation, as if she had struggled while being held underwater. Miller concluded the cause of death was drowning "in association with sexual assault." In his opinion, the drowning and sexual assault were contemporaneous.

When found, April was wearing only a white Betty Boop T-shirt and a bra. Police recovered a pair of black pants from the bathroom. A rectal swab taken during the autopsy revealed the presence of sperm. Charlie Richardson, Bobby Joe Marshall, and Joe Mills were excluded as possible sources of the sperm. No usable fingerprints were recovered from the scene.

Before defendant's trial, Charlie Richardson was convicted of the murder, burglary, and sexual assault of April and received the death penalty.[4] The jury was informed of these convictions.

Defendant and his girlfriend lived with his sister and her boyfriend in the Tract. Naomi, April's mother, had known defendant for three or four years. He visited on occasion and stayed overnight once in September 1988. Tammy and defendant had been friends for several years. She had known Richardson for about a month and he would

---

**4**     We have previously affirmed Richardson's death judgment. (*People v. Richardson* (2008) 43 Cal.4th 959.)

5

also visit her at the trailer.  Tammy never spent time with Richardson and defendant together.

Teenagers Bobby Joe Marshall and Joe Mills both lived in the Tract.  About 7:00 p.m. that Saturday, they were going hunting with a neighbor.  After borrowing guns, they walked to the neighbor's house.  The neighbor drove for the excursion but turned back after 30 to 40 minutes because it was too foggy.  After returning to the Tract, the boys walked back to Marshall's trailer.  During the walk, Mills fired his gun to scare someone walking nearby.  According to Mills, they may also have shot at a mound in the area.  The boys walked to the Holleys' trailer about 8:15 p.m. to see April's sister Tammy.  Although the television was blaring, they left when no one answered the front door.  On their walk back, they encountered Richardson.

The boys returned to Marshall's trailer about 8:45 p.m. and sat outside.  Defendant drove up in a "loud," brown Pontiac Firebird belonging to his sister, Lisa Saldana.  Defendant agreed to drive the boys to Linnell Camp to buy cocaine.[5]  On the way, they stopped at the cotton processing plant where defendant's girlfriend, Rhonda Schaub, worked.  All the witnesses referred to the plant as "the cotton gin."  Mills estimated that they arrived about 10:00 p.m. and stayed 15 to 20 minutes.  Marshall claimed they arrived about 9:20 p.m. and left 30 minutes later.  The three proceeded to a shopping mall in Visalia, staying for 20 minutes, then went on to Linnell Camp where defendant bought cocaine.  They drove around for a while, consuming the drugs.  They returned to the mall, then stopped at the cotton gin for a few minutes between 12:30 and 1:00 a.m.  They drove around again, using more cocaine before driving back to the Tract.  On the way, the car ran out of gas, so they left it at the side of the road.  They initially walked together but later split up.  The boys walked toward the Marshalls' and defendant went in the general direction of the Holleys' trailer.  The boys stayed outside and used more drugs, going

---

[5]     Mills testified that defendant left and returned 20 to 30 minutes later to drive them. Marshall testified defendant did not leave and drove them without delay.

inside between 2:00 and 2:30 a.m. Marshall saw Charlie Richardson at his trailer before going to sleep about 3:00 a.m. Mills spent the night and left the following morning, arriving at his own home about 9:00 a.m.

Mary Coelho was a friend of defendant's sister Lisa Saldana. About 7:00 a.m. on Sunday, December 4, Coelho went to Saldana's trailer. The women used cocaine and talked. About 15 minutes later, defendant came into the living room and looked outside nervously. He commented that "there were a lot of cops out there" and that "something had happened." Coelho saw no officers. Saldana thought defendant was "acting like someone on drugs."

Kimberly Fleeman arrived at the Marshalls' between 10:00 and 10:30 a.m. on Sunday. In one of the bedrooms, she saw Marshall, Richardson, and the feet of a third person. All three were sitting on a bed. She heard a voice that she recognized as defendant's say: "The little bitch deserved everything she got." She then heard Marshall say, "We've got to get our stories straight." Fleeman acknowledged that she told an investigator about these statements but later retracted them, claiming she had lied. She asserted she had retracted her earlier statements because she had been threatened.

Defendant's girlfriend Rhonda Schaub suspected he was involved in April's death and repeatedly asked him about it. One morning in mid-December 1988, after Schaub again confronted him, he angrily confessed. Schaub related that defendant said "he had killed April" and "they would never catch him." He said that, on Saturday, he picked up Marshall and Mills. They saw April walking and the three of them, along with Charlie Richardson, accompanied her to the Holleys' trailer. Contradicting his confession, he then claimed he, Marshall, and Mills left because April got angry. On cross-examination, Schaub conceded that she did not mention defendant's confession to police or defense investigators, and she had previously denied that defendant had confessed.

Victoria Lopez lived in the Tract with her boyfriend and knew Marshall. About six months after the murder, Marshall said he, Richardson, and another man were with

7

April that night. They were playing music and dancing with April, which led to kissing and touching. He said "they went into the bathroom and that's where it all happened." "They all fucked her." Lopez did not tell anyone about Marshall's statements until 1991. She subsequently made various inconsistent statements about the circumstances of the conversation.

A young man named Lynn Farmer met defendant in May 1990, when Farmer was 14 or 15 years old. On May 30, 1990, defendant and Farmer talked about having a party and defendant suggested they steal some purses to finance it. Farmer recruited a couple of his friends and the four of them eventually went to a Tulare motel. Defendant and Farmer waited upstairs while the friends stayed on the ground floor. After a few minutes, there were screams downstairs. Defendant and Farmer looked to see two elderly women on the ground. As the men fled from the motel, defendant said, "Man, if I get busted for this, man, I'll get busted, you know, they'll hook me up with the old lady and April." He said that he "did the same thing to the old lady as he did to April," explaining he "[f]ucked her in her ass." Defendant threatened to hurt Farmer if he "ratt[ed]" on him.

Officers interviewed defendant twice. In January 1989, defendant related that, on Saturday, December 3, he met Marshall and Mills at 11:00 p.m. and drove them to Linnell Camp to buy cocaine. He stopped by the cotton gin, then drove around with the boys using the drugs. After the car ran out of gas, the boys walked home and defendant walked to his sister's residence, arriving at about 4:10 a.m. When he told his sister about the car, she angrily told him to retrieve it. A man known as J.D. drove defendant to get gas. On the way, they saw two men run across the street. Defendant recognized them as Charlie Richardson and James Stubblefield. Richardson had something resembling a pipe in his hand. Defendant and J.D. obtained the gas and drove Saldana's car back to the trailer, after which defendant went to sleep. He woke up between 11:00 a.m. and noon and learned April had been killed. He claimed Stubblefield had previously tried to

8

molest April and urged the police to investigate. Defendant acknowledged that he knew Charlie Richardson.

After defendant was arrested for April's murder, he asked to meet with officers and was interviewed in September 1990. He conceded that he had lied about seeing Richardson and Stubblefield crossing the street. He now claimed he drove his girlfriend to work at about 6:00 p.m. that Saturday. Asked what he did between 6:00 p.m. and after 8:00 p.m. when Schaub clocked in to work, defendant said he could not remember because they were on drugs and they could have been having sex. Defendant maintained that he picked up Marshall and Mills at the Tract between 8:30 and 9:00 p.m., took them to Linnell Camp, bought cocaine, then drove back towards the Tract at about 2:00 a.m. When the car ran out of gas, he walked back to his sister's trailer. He could not explain why he did not arrive at his sister's until after 4:00 that morning. He admitted acting strangely the following day, but claimed he did so only after learning about April's death and because he was still high on cocaine. He denied killing April or going to the Holleys' trailer on Saturday night. He also denied committing a purse snatching with Farmer or making any statement about April to him.

2. Defense

The defense called a variety of witnesses. Two men who had been romantically involved with witness Vickie Lopez testified she was not trustworthy. Jessie Bradley testified he drove around with Charlie Richardson between 7:00 and 9:30 p.m. on Saturday, December 3, then dropped him off at a house. An occupant of that house testified she saw Richardson there about 8:00 or 9:00 p.m. Rhonda Schaub clocked into work at the cotton gin on Saturday at 8:14 p.m. Lynn Farmer made various inconsistent statements to police about the details of the purse snatching he committed with defendant.

Defendant called several witnesses to rebut Kimberly Fleeman's testimony that she heard defendant say on the morning following the murder, " 'The little bitch deserved everything she got.' " Three witnesses testified they did not see Fleeman on Sunday,

9

December 4. All admitted, however, that they did not arrive at the Marshalls' trailer until after 11:00 a.m. Marshall's father testified a person could not hear a conversation from where Fleeman had claimed to be unless people were "close to yelling." Contrary to his trial testimony, Mills had told police that he did not recall seeing Fleeman that morning. Fleeman made various inconsistent statements to police about the circumstances of defendant's statement, including that she might not have heard the conversation herself.

The prior testimony of Tammy Petrea was read to the jury. On the night of the murder, Petrea was visiting a friend at the Tract. About 11:00 p.m., the two were watching television when Charlie Richardson arrived. The friend went to his father's nearby trailer to use the bathroom. Richardson made a "pass" at her, then asked if she had heard "about April Holley getting killed." Richardson told her "they did it" because April "had something on him" and he did not want her to testify. He indicated he "fucked her and he drowned her" in the bathtub, plugging the drain with a rag. Richardson threatened Petrea harm if she told anyone about his statements.

Defendant did not testify.

B. Penalty Phase

1. Prosecution

The prosecution presented evidence of defendant's involvement in five other incidents. (1) Without provocation, defendant hit Bruce Rummerfield (Bruce) in the head with a bat. (2) In September 1988, defendant forced a woman into oral copulation and intercourse, then threatened to kill her if she told police. (3) On December 13, 1988, defendant pushed Eunice Atherton to the ground and stole her purse. (4) On May 28, 1990, defendant attacked and sexually assaulted 74-year-old Margaret Allen in her Tulare home. He hit her in the head repeatedly with a broken pool cue, choked her, and tried to smother her with a pillow. He sexually penetrated her repeatedly with the pool cue, dragged her to the bathtub and started the water. He wielded a knife and warned her not to report the attack. When Allen was finally able to lock him out of the bathroom, he

10

stole numerous items and left. Police later recovered her property in defendant's possession. (5) Two days after the Allen incident, Dorothy Tarbet and her 84-year-old mother were robbed of their purses in a Tulare motel by two young men who ran up from behind and pushed the mother to the ground.[6]

### 2. Defense

Defendant testified and admitted beating Bruce with a bat, explaining he did so because Bruce was "messing" with his brother's girlfriend and his brother had asked him to commit the assault. He denied the 1988 rape, claiming the sexual encounter was consensual. He also denied attacking Margaret Allen, as well as any involvement with the two purse snatchings. Although maintaining his innocence of the charged offenses, defendant told the jury that he preferred death to life in prison, and asked the jury to return such a verdict. On cross-examination, defendant admitted he had suffered convictions for offenses arising from the Allen and Eunice Atherton incidents.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Dr. Miller's Testimony

Defendant challenges on several grounds the trial court's failure to exclude Dr. Miller's testimony that the victim died by drowning " 'in association with sexual assault.' " Before trial, defense counsel moved to exclude the conclusion. Noting the nature of the special circumstance alleged, counsel argued such testimony would constitute an opinion as to "an ultimate finding that sustains a special circumstance."[7]

---

[6] This was the same incident about which Lynn Farmer testified during the guilt phase.

[7] The felony-murder special-circumstance statute applies to a murder "committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit," the enumerated felony. (Pen. Code, § 190.2, subd. (a)(17).) CALJIC No. 8.81.17 (Special Circumstances—Murder in Commission of_____), as given here, required a finding that "a murder was committed while the defendant was engaged in the

11

Quoting a portion of Miller's preliminary hearing testimony, the prosecutor countered that Miller could explain to the jury what he meant by "in association with sexual assault" and that such a description was "his nomenclature in the formation of his opinion, based upon what he has observed in this particular case." The trial court denied the motion to exclude but ordered that Miller not give an opinion phrased in the language of the special circumstance statute.

At trial, Dr. Miller testified that the victim died by drowning "in association with sexual assault." When asked what he meant by that, Miller stated: "This implies and denotes that there was trauma involved in producing the drowning, and further verified by the findings of the bruising of the neck, which I've already discussed. In brief, this individual was forcibly held under the water and drowned." On cross-examination, Miller conceded that the victim did not die "from the sexual assault," but asserted that the sexual assault "occurred in a fairly concurrent fashion" with the victim's death. Miller clarified that his opinion took into account information given to him about the crime, in addition to information gathered from the autopsy.

Defendant first contends that Dr. Miller was not qualified to give such an opinion. He also suggests Miller's testimony was based upon unreliable evidence.[8] Not so. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) An expert witness may give opinion testimony "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be

_____

commission or attempted commission" of a specified felony, and "the murder was committed in order to carry out or advance the commission of" the felony or "to facilitate the escape therefrom or to avoid detection."

[8]	This aspect of defendant's claim has been forfeited by his failure to object on this ground in the trial court. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 948-949.)

relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801, subd. (b).) "The trial court's determination that a witness qualifies as an expert is a matter of discretion that will not be disturbed absent a showing of manifest abuse." (*People v. Jones* (2012) 54 Cal.4th 1, 57 (*Jones*).)

Defendant concedes that Dr. Miller is a forensic pathologist qualified to testify regarding the victim's cause of death. However, he argues that Miller did not have sufficient expertise to testify that the sexual assault occurred "concurrently" with the death by drowning. The claim lacks merit. "A forensic pathologist who has performed an autopsy is generally permitted to offer an expert opinion not only as to the cause and time of death but also as to circumstances under which the fatal injury could or could not have been inflicted." (*People v. Mayfield* (1997) 14 Cal.4th 668, 766 (*Mayfield*); see *Jones, supra,* 54 Cal.4th at p. 57.) A claim similar to that made here was rejected in *Jones*. Whether a victim was raped and sodomized before or after death "is a relevant circumstance of death for which a qualified forensic pathologist might offer an opinion in an appropriate case." (*Jones,* at p. 58.)

Dr. Miller is an experienced pathologist, having performed approximately 4,000 autopsies in his career. He opined that the victim had been forcibly drowned during a struggle. Petechiae on April's face reflected force had been applied there. Her lungs, but not her stomach, were filled with water, suggesting she had actively inhaled water while her esophagus was forced closed. Miller was well qualified to testify regarding the nature of the victim's injuries and the circumstances surrounding her death. In light of the evidence of recent sexual assault and the forcible nature of the drowning, Miller could properly opine that those events occurred contemporaneously. "Once an expert witness establishes knowledge of a subject sufficient to permit his or her opinion to be considered by a jury, the question of the degree of the witness's knowledge goes to the weight of the evidence and not its admissibility." (*Jones, supra,* 54 Cal.4th at p. 59; see *People v.*

13

*Robinson* (2005) 37 Cal.4th 592, 631-632; *Mayfield, supra,* 14 Cal.4th at p. 766.) We note that Miller's testimony was corroborated by Dr. McCann, a pediatrician specializing in child sexual abuse cases. McCann testified at length regarding the autopsy findings that April suffered various injuries consistent with sexual assault.

Defendant next argues Dr. Miller's opinion should have been excluded because it did not assist the jury. Defendant asserts that Dr. Miller had "no special expertise" in determining whether the victim's death and the sexual assault occurred contemporaneously and "[t]he jurors had all of the relevant evidence" to make that determination itself. Defendant has forfeited this claim by failing to raise it in the trial court. (*People v. Edwards* (2013) 57 Cal.4th 658, 709.) In any event, the claim lacks merit. An expert may give opinion testimony "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact[.]" (Evid. Code, § 801, subd. (a).) "That is not to say, however, that the jury need be wholly ignorant of the subject matter of the expert opinion in order for it to be admissible. [Citation.] . . . Rather, expert opinion testimony ' "will be excluded only when it would add *nothing at all* to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that [those with] ordinary education could reach a conclusion as intelligently as the witness' " [citation].' [Citation.]" (*Jones, supra,* 54 Cal.4th at p. 60.) "The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

Again, a similar claim was rejected in *Jones*: "Applying his knowledge, skill, experience, training, and education to all the evidence presented, [the autopsy surgeon] reached the conclusion that [the victim] had been raped and sodomized, and that these acts had taken place before she died. This opinion provided an informed forensic context that went beyond the jurors' common fund of information and could have assisted the

jury in determining defendant's intent *and timing* in sexually assaulting [the victim], which was relevant to the special circumstance allegations that the murder took place during the commission of rape, sodomy, and burglary. Accordingly, the opinion was the proper subject for expert testimony . . . ." (*Jones, supra,* 54 Cal.4th at p. 61, italics added.) The same reasoning applies to Dr. Miller's testimony.

Defendant claims Dr. Miller's testimony amounted to an opinion on defendant's guilt, in particular the truth of the special circumstance allegations. "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) The trial court did not abuse its discretion. Miller did not opine as to defendant's guilt or the truth of the special circumstance allegations. (See Pen. Code, § 190.2, subd. (a)(17).) Further, the expert's opinion "did not bind the jurors on this point or preclude them from considering other relevant evidence." (*People v. Lindberg* (2008) 45 Cal.4th 1, 49.) Indeed, Miller conceded on cross-examination that the sexual assault itself was not fatal and that his opinion considered information beyond that learned during the autopsy. The court properly instructed the jury regarding the consideration of expert testimony, telling jurors they were not bound to accept the opinion. Instead, they "should give it the weight to which you find it to be entitled" and "may disregard any such opinion." (CALJIC No. 2.80 (5th ed. 1988) [Expert Testimony].)

Finally, defendant contends Dr. Miller's opinion should have been excluded under Evidence Code section 352, which provides trial courts with discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Defendant argues Miller's testimony was misleading because his opinion that the victim's drowning occurred in association with sexual assault tracked too closely the statutory language of the special circumstances. Defendant did not object in the trial court on this ground, thus forfeiting his claim. (*Jones, supra,* 54 Cal.4th at

15

p. 61.)  In any case, the claim fails.  It is essentially an argument that the evidence should have been excluded because it pointed to his guilt.  A party cannot seek to exclude evidence merely because it is helpful to the other side.  Only if there is substantial risk of prejudice, confusion, or time consumption sufficient to outweigh relevance is an Evidence Code section 352 objection well founded.  (See *People v. Doolin* (2009) 45 Cal.4th 390, 438-439.)  Miller explained what he meant by his use of the "in association" phrase and the factual bases of his opinion.  Any potential for confusion was resolved by the explanation given and by the court's instructions.  Finally, defendant cites no authority for the proposition that otherwise admissible testimony may not track the language of the statute.  We need not resolve that question here because the court ruled that Dr. Miller could not testify in the language of the statute.

     2.  Uncharged Offense Evidence

The defense argues the trial court erred by allowing Lynn Farmer to recount defendant's statements not only implicating him in the present murder but also in his commission of a sexual assault 18 months later.  In limine, the prosecutor moved to admit testimony about defendant's attack on 74-year-old Margaret Allen.  He urged the evidence should be admitted to show defendant acted with a common design or plan in both instances.  (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403; Evid. Code, § 1101, subd. (b).)  After a lengthy hearing, the trial court excluded the proposed testimony.

The prosecutor sought clarification that he could still present defendant's statement to Farmer that he had done to April what he had done to "the old lady."  The prosecutor argued the statement was a party admission.  The trial court agreed and admitted the statement.  (Evid. Code, § 1220.)  Defense counsel objected but argued that if it was admitted, no other evidence of the attack on Allen should be presented.

At the preliminary hearing, Farmer related that during the 1990 Tulare motel purse-snatching, defendant stated, " 'Man, if I get busted for this I will get busted—

16

they'll hook me up to April Holley and the old lady.' " Defendant elaborated that he "fucked the old [lady] in the ass" and he "did the same thing to April Holley as he did to the old lady." Farmer understood "the old lady" to be Allen, whom he knew from the neighborhood.

The prosecutor sought to elicit testimony regarding this purse snatching and another planned purse snatching on the night of April's murder to provide context for Farmer's testimony and to bolster Farmer's credibility. The trial court ruled Farmer could describe the motel purse snatching for context. It excluded testimony that defendant, Marshall, and Mills went to the mall looking for purse snatch victims on the night of April's murder.

Defendant makes no argument that the motel purse snatching should have been excluded. His claim focuses exclusively on evidence concerning the Allen incident. Defendant argues at length that the Allen incident was too dissimilar to the present attack to be admissible as showing a common design or plan. Yet, he won that battle in the trial court. The only potential reference to Allen came from defendant's statement regarding "the old lady" and how he had done the same thing to April.

Defendant first suggests his statements to Farmer were not relevant. "A defendant's own hearsay statements are admissible against him [citations], as long as they satisfy the test of relevance." (*People v. Lewis* (2008) 43 Cal.4th 415, 529; Evid. Code, § 1220.) " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Defendant's statements were manifestly relevant. They linked him to April's death and the particular manner of her sexual assault. Defendant asserts the statements, by themselves, did no more than admit he had sexual contact with April at some undisclosed point. The statements did more than that. Defendant expressed concern that he would be "busted" for his conduct with April, indicating an awareness of criminal culpability. Defendant's statements were properly admitted as

17

relevant statements by a party. (Evid. Code, § 1220; *People v. Von Villas* (1992) 10 Cal.App.4th 201, 264.)

Defendant contends that the jury would have improperly speculated as to the nature of the Allen incident, particularly whether it involved forcible sodomy and murder. Noting that Allen was not sodomized but penetrated with a pool cue, he argues "the depiction of the uncharged act was an *incomplete and distorted description* of an event *that did not actually occur.*" The argument misses the mark. A defendant's statement that links him to a charged offense does not become inadmissible merely because the statement also mentions an uncharged offense. "Admissions that tend to prove the declarant committed a charged offense, however, are not offered as other crimes evidence, and instead are offered simply as statements made by a defendant that in and of themselves tend to prove he committed a charged offense. . . . The circumstances under which the admission was made are also admissible to place the statement in context, and a limiting instruction regarding the surrounding circumstances may be appropriate depending on the particular circumstances, but the statement itself is admissible simply because it is an admission, subject to the exercise of discretion under Evidence Code section 352." (*People v. Robinson* (2000) 85 Cal.App.4th 434, 445.)

The trial court acted properly here. At defendant's urging, the court excluded details of the Allen incident except a passing reference to "the old lady" in defendant's own statement linking himself to the victim here. It instructed that evidence of an uncharged offense "was not received and may not be considered by you to prove that defendant is a person of bad character, or that he has a disposition to commit crimes." (CALJIC No. 2.50 (1994 rev.) (5th ed. 1988) [Evidence of Other Crimes].) It instructed on the proper consideration of admissions. Further, the prosecutor never suggested that defendant must have committed these offenses because he also committed the Allen offenses. Indeed, defense counsel argued at length that the circumstances of defendant's statements showed Farmer lied about them.

18

3. Evidence of Defendant's Confession

Defendant contends the trial court should have excluded evidence of his statement to his girlfriend Rhonda Schaub confessing that he killed April. As recounted above, Schaub testified she confronted defendant about April's death in mid-December 1988 and he confessed to killing her, but claimed he would not be caught.

Defendant argues Schaub's testimony about his confession was inherently unreliable and untrustworthy. On cross-examination, Schaub conceded she gave six statements, two each to police, Richardson's investigator, and defendant's investigator, yet never mentioned a confession. In one interview with defendant's investigator, she denied that defendant had confessed. She did not reveal the confession until 33 months after her initial police interview. She also gave inconsistent accounts of where the confession allegedly occurred. Schaub also conceded that she was using drugs and was angry with defendant at the time. She admitted badgering him about April's murder.

These points go to the weight of the evidence, not its admissibility. It is doubtful that "the testimony of an ordinary witness who claims to have heard the confession or damaging admission of a criminal defendant may be excluded from evidence on the ground that it is inherently improbable." (*Mayfield, supra,* 14 Cal.4th at p. 735; see also *People v. Hovarter* (2008) 44 Cal.4th 983, 996 (*Hovarter*).) "Eyewitness testimony may be vulnerable to impeachment for numerous reasons, including the possible existence of prior, conflicting testimony; such vulnerability, however, does not render the evidence irrelevant or unduly prejudicial." (*People v. Alcala* (1992) 4 Cal.4th 742, 790 (*Alcala*).) " 'Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution . . . .' [Citation.]" (*Hovarter*, at p. 996.) "The standard for rejecting a witness's statements on this ground requires ' " 'either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' " ' [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 124.)

19

The evidence casting doubt on Schaub's credibility was presented to the jury and argued at length by counsel. The evidence highlighted by defendant did not reveal demonstrable falsity or physical impossibility. Indeed, the trial court would have abused its discretion had it excluded Schaub's testimony simply because the court disbelieved her. (*Alcala, supra,* 4 Cal.4th at pp. 790-791.) The trial court acted properly in leaving the weight of the testimony to the jury. (See *Hovarter, supra,* 44 Cal.4th at pp. 995-999 [jailhouse informant's testimony regarding the defendant's confession not excludable on ground of unreliability]; *Mayfield, supra,* 14 Cal.4th at pp. 735-736 [same as to a deputy's testimony regarding the defendant's postarrest statements].)

4. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence. He argues that the only testimony as to April's time of death was Dr. Walter's observation that the presence of rigor mortis was consistent with death at 9:00 p.m. on Saturday, but prosecution witnesses Marshall and Mills gave him an alibi for that time. To the extent the prosecutor alternatively argued April could have been killed between 2:00 and 4:00 a.m. on Sunday, defendant asserts there was no evidence in support.

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or

20

reevaluate a witness's credibility." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129; see *People v. Scott* (2011) 52 Cal.4th 452, 487.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*); see *People v. Elliot* (2012) 53 Cal.4th 535, 585.)

There is abundant evidence April was sexually assaulted and murdered. The essence of defendant's challenge is that he was not proven to have participated in those crimes. The claim fails. He admitted to his girlfriend Rhonda Schaub that he did so. He told Farmer he had to avoid arrest for the subsequent purse snatching because the police would connect him "with April." Hours after the murder, he was heard to say "[t]he little bitch deserved everything she got." When first interviewed by police, he lied and implicated a man whom he later admitted had nothing to do with these events. He gave a second statement recounting his whereabouts that contained two significant gaps of time.

Defendant argues at length that witnesses testifying about these statements were untrustworthy, had given inconsistent statements, had delayed reporting, and were drug users. The jury heard the direct testimony and extensive cross-examination of each witness. It heard evidence from rebuttal witnesses. The credibility question was vigorously argued. The final determination as to the weight of the evidence is for the jury to make. We do not reweigh it and substitute our view for theirs. (See *People v. Lee* (2011) 51 Cal.4th 620, 632; Evid. Code, § 312.)

Defendant's other attacks on evidentiary sufficiency also fail. Although Dr. Walter estimated April may have died at 9:00 p.m., he acknowledged the estimate, based upon the presence of rigor mortis, was not conclusive. Rigor mortis could begin in as little as three to four hours after death, peaking between 12 to 36 hours later. Variables such as fluctuations in body temperature could change the estimate. As noted, April was found partially nude in a bathtub and lying in water. It was a cold winter night. Further,

21

nothing in Walter's testimony precluded a finding that April was killed between 2:00 and 4:00 a.m. on Sunday, a time for which defendant had no alibi.

Even assuming April was killed earlier, the jury could reasonably conclude defendant had the opportunity to participate in April's murder. It was undisputed that defendant knew April and where she lived. He knew the Holley family and had spent a night at the trailer. Testimony reflected that, on the night of the killing, April was driven back to the trailer sometime between 7:00 and 8:00 p.m. She went to Hughes's trailer between 7:45 and 8:00 p.m. The Holleys' next-door neighbor saw a car pull up to the Holleys' trailer about 8:30 p.m. The jury could have concluded this was defendant's car.[9] This time frame was consistent with him dropping Schaub off at the cotton gin about 8:00 p.m. and not meeting Marshall and Mills until 8:45 p.m. Mills testified that defendant left again for 20 to 30 minutes before returning to give them a ride. Mills also indicated the three did not reach the cotton gin until 10:00 p.m., while Marshall estimated they arrived around 9:20 p.m. Witnesses heard screaming around 9:00 p.m. These time estimates would make defendant available for an attack on April at a time consistent with Dr. Walter's estimate. Obviously, the jury was entitled to disregard some or all of the teenagers' testimony and time estimates given their drug use and their own potential involvement.

Although the physical evidence did not directly tie defendant to the crime, the jury could find the evidence supported defendant's guilt. The autopsy reflected April suffered substantial lacerations to her vagina and rectum consistent with penetration by multiple assailants. Dr. McCann testified this scenario was more likely than one involving only a single attacker. Sperm was found in April's rectum, which was consistent with

---

[9]    Defendant claims the parties stipulated that the neighbor saw a car pull up in front of the Holley residence at 8:00 p.m. Not so. The parties stipulated the neighbor *told a police investigator* that she saw a car at 8:00 p.m., but she testified at trial that she saw the car between 8:25 and 8:30 p.m. The jury was not obligated to credit the neighbor's prior police statement over her trial testimony.

defendant's crassly phrased statement to Farmer that he had anal intercourse with April. Although testing of the sperm did not directly implicate defendant as the donor, it excluded all of the other potential assailants, including Richardson, Marshall, and Mills.

B. Penalty Phase Issues

1. Ineffective Assistance of Counsel

Defendant contends his counsel was ineffective and failed to exercise reasonable professional judgment in acceding to his own decision to present no mitigating evidence and request the death penalty. He claims counsel's conduct denied him due process and his rights to be free from cruel and unusual punishment, and to a reliable death penalty determination.

Before the penalty phase, counsel made an extensive record of defendant's wishes. Counsel indicated there would be no cross-examination of prosecution witnesses or evidence in mitigation. Defendant would testify and inform the jury he wished to receive the death penalty. Counsel expressed the belief that defendant was making an "informed choice," having discussed his decision with counsel at least three times and other times with his paralegal. These discussions occurred over the span of a week, with the last one occurring the day before the hearing.

Defense counsel assured the trial court that defendant was not "depressed because of the verdict." Counsel stated: "It's an informed choice because in detail I informed Mr. Brown about the potential mitigation that could be put on his behalf. And in essence, he's giving up the right to present this mitigation." Defense counsel noted that he had performed an "extensive background investigation." The investigation included interviewing family members and obtaining "medical records, school records, records from the Youth Authority, prison, schools, and the probation department," as well as his juvenile records. Defendant had been interviewed by two psychologists, once "several years ago" and again during the guilt phase.

23

Counsel represented that "[t]here are mitigating facts that could have been presented that come from his background in the form of abuse and neglect. The psychologist has mitigating facts that she could present . . . . Another theme that could have been pursued is institutional failure. I think there were signs in his background that gave hints of certain things that were essentially ignored." Counsel discussed "all of these things and a few others" with defendant and counsel believed he "understands them thoroughly." Defendant told counsel he did not "want to put his family through the ordeal of having to testify here." He also preferred the death penalty to serving a term of life without the possibility of parole. Accordingly, defendant made a choice not to present mitigating evidence or to cross-examine the prosecution's witnesses. Counsel also represented that defendant wished to absent himself entirely from the penalty phase, except for his own testimony, and that he would stipulate to any identification of him by the prosecution witnesses.

The trial court questioned defendant at length. Defendant confirmed that he had met with defense counsel and the investigator to discuss the penalty phase. It was his desire to forgo mitigating evidence, cross-examination, and his presence during trial. Defendant understood that these actions "could be an advantage to the prosecution" and that "there's a good likelihood that the jury's going to come back with a recommendation of the death penalty[.]" He confirmed that he had "given this a lot of thought." When the court asked why he wanted to proceed in such a fashion, defendant responded, "I'd rather do a death sentence than do life without." The court explained that it would be "difficult, if not impossible" to successfully appeal on these issues. Defendant stated he understood. When asked if he wanted more time to think about his decision, defendant stated: "I've been thinking about this since 1992,[10] either bad or good deciding what I was going to do if I was convicted of this crime. I made that decision with my attorney

---

**10**     Defendant was charged in November 1991.

24

that I would accept that. I would much rather have a death sentence than a life sentence." Defendant had not been taking any medication or suffering from an illness that would impair his ability to think clearly. Defendant yet again affirmed his desire to present no mitigation and be absent from proceedings. The court found "that the defendant's wishes regarding the penalty phase are informed, they're voluntary, and they're given intelligently."

As noted, several prosecution witnesses described other offenses committed by defendant. (Pen. Code, § 190.3, factor (b).) Defense counsel did not cross-examine. Defendant testified and denied killing April and committing most of the offenses described at the penalty phase, then expressed his preference for the death penalty. During closing argument, defense counsel repeated defendant's desire for the death penalty and simply urged the jury to "follow the law."

" 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. . . .' [Citations.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 391; see *Strickland v. Washington* (1984) 466 U.S. 668, 694.)

Defendant asserts his counsel was ineffective for acquiescing in defendant's preference for the death penalty.[11] Defendant relies principally upon *People v. Deere*

---

[11] Although defendant separately claims that his counsel was ineffective for failing to present mitigating evidence over defendant's objection, that argument is essentially a restatement of this claim.

25

(1985) 41 Cal.3d 353 (*Deere I*), the continued precedential value of which has been sharply and repeatedly circumscribed. Deere pleaded guilty to special circumstances murder. He waived a jury trial as to penalty and stipulated the trial court could consider the transcript of the preliminary and suppression hearings. Defense counsel made a lengthy record explaining why he allowed the defendant to proceed in this manner. Deere testified he deserved death, and the trial court imposed that sentence. (*Id*. at p. 357.)

This court reversed the penalty. Writing for the majority, Justice Mosk likened allowing "a defendant convicted of a potentially capital crime to bar his counsel from introducing mitigating evidence at the penalty phase because he wants to die" to permitting a defendant to "misus[e] the judicial system to commit a state-aided suicide." (*Deere I, supra,* 41 Cal.3d at p. 363.) Justice Mosk suggested "the state's interest in a reliable penalty determination," as well as this court's "constitutional and statutory duty to review a judgment of death upon the complete record of the case," would be defeated if a defendant may prevent the introduction of mitigating evidence. (*Id*. at pp. 364, 363.) Finally, Justice Mosk concluded defense counsel rendered ineffective assistance, reasoning that counsel's authority extended to decisions regarding whether to call particular witnesses, and "here counsel made no effort to call any such witnesses on defendant's behalf." (*Id*. at p. 367.)

As we have observed, however, subsequent decisions "have largely undermined the court's holding in *Deere I*." (*People v. Deere* (1991) 53 Cal.3d 705, 716.) The first such case was *People v. Bloom* (1989) 48 Cal.3d 1194 (*Bloom*), which disapproved *Deere I*'s suggestion that the failure to present mitigating evidence affected the reliability of a death verdict: "[T]he required reliability is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of

26

penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present. A judgment of death entered in conformity with these rigorous standards does not violate the Eighth Amendment reliability requirements." (*Bloom*, at p. 1228; see also *id.* at p. 1228, fn. 9.)

In *People v. Lang* (1989) 49 Cal.3d 991 (*Lang*), the defense relied upon *Deere I* to claim counsel rendered ineffective assistance by agreeing to Lang's request that his grandmother not be called as a mitigating witness. *Lang* noted that, under *Bloom*'s reasoning, "the death judgment in this case is not to be regarded as unreliable merely because defense counsel agreed to defendant's request that his grandmother not be called to testify as a defense witness at the penalty phase." (*Lang*, at p. 1030.) *Lang* reasoned: "To require defense counsel to present mitigating evidence over the defendant's objection would be inconsistent with an attorney's paramount duty of loyalty to the client and would undermine the trust, essential for effective representation, existing between attorney and client. Moreover, imposing such a duty could cause some defendants who otherwise would not have done so to exercise their Sixth Amendment right of self-representation (see *Faretta v. California, supra*, 422 U.S. 806) before commencement of the guilt phase [citations] in order to retain control over the presentation of evidence at the penalty phase, resulting in a significant loss of legal protection for these defendants during the guilt phase." (*Id.* at p. 1031.) *Lang* alternatively concluded that, even assuming counsel acted improperly, the doctrine of invited error barred an ineffective assistance claim "based on counsel's acts or omissions in conformance with the defendant's own requests." (*Id*. at p. 1032.) *Lang* observed "that defendant predicates the claim of ineffective assistance solely on his trial counsel's action in yielding to his demand, and not on any antecedent act or omission of counsel." (*Ibid.*)

Subsequent cases have applied *Bloom* and *Lang*. For example, *People v. Sanders* (1990) 51 Cal.3d 471, concluded defense counsel did not render ineffective assistance by acceding to the defendant's request to forgo mitigating evidence: "At least in the

absence of evidence showing counsel failed to investigate available mitigating evidence or advise defendant of its significance [citation], we cannot say defendant's trial attorney provided ineffective assistance of counsel." (*Id.* at p. 526, fn. omitted.) The defendant attempted to distinguish prior cases by noting "he presented absolutely no mitigating evidence in this case," but *Sanders* found no grounds for reversal: "Defendant's knowing and voluntary decision to forgo his right to present mitigating evidence, cross-examine adverse witnesses, and present closing argument at the penalty phase of his trial estops him from now claiming an entitlement to a reversal based on those decisions." (*Id.* at p. 527, citing *Lang, supra,* 49 Cal.3d at pp. 1031-1032; see also *In re Avena* (1996) 12 Cal.4th 694, 731-732 [noting *Deere I* has been disapproved to the extent it held counsel necessarily renders ineffective assistance by acquiescing in his client's desire for the death penalty, citing *Sanders*]; cf. *People v. Snow* (2003) 30 Cal.4th 43, 118-123 [applying *Bloom* and *Lang* in rejecting claim that defense counsel was ineffective for waiving penalty phase jury argument]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1372 [the trial court did not err in granting the defendant self-representation "even if it understood that his intent was not to present any mitigating evidence"].)

Defendant asserts *Lang* did not overrule *Deere I* to the extent it held the decision whether to present mitigating evidence is a tactical one for counsel. According to defendant, although counsel is not *necessarily* ineffective for acquiescing in a defendant's desire to present no mitigation, counsel must still exercise professional judgment. Thus, the defendant's choice is but one factor bearing upon *counsel's* tactical decision whether to present such evidence.

Defendant misreads *Lang*. *Lang* observed that "an attorney's duty of loyalty to the client means the attorney 'should always remember that the decision whether to forego legally available objectives or methods *because of non-legal factors* is ultimately for the client . . . .' [Citation.]" (*Lang, supra,* 49 Cal.3d at p. 1031, italics added.) Nothing in *Lang* suggested that such a decision by a defendant based upon *nontactical* factors could

28

be overruled by counsel's assessment of the relative *tactical* merits of a defendant's case. Indeed, as noted, *Lang* suggested that such authority would be detrimental to the attorney-client relationship and might lead defendants to imprudently seek self-representation at the guilt phase. (*Ibid*.)

*Lang* teaches that counsel must properly investigate the case in mitigation and advise his client regarding its relative merits and significance. After having been advised by counsel, if a competent defendant decides for nontactical reasons to present no mitigating evidence, he cannot later label counsel ineffective for honoring defendant's own wishes. (See *People v. Williams* (1988) 44 Cal.3d 1127, 1152-1154 (*Williams*).)

Federal cases are in accord and, if anything, provide a less stringent rule. The United States Supreme Court in *Schriro v. Landrigan* (2007) 550 U.S. 465 (*Schriro*), reasoned that if the defendant had "instructed his counsel not to offer any mitigating evidence" at the penalty phase of a capital trial, "counsel's failure to investigate further could not have been prejudicial under *Strickland*." (*Id*. at p. 475.) *Schriro* concluded: "The District Court was entitled to conclude that regardless of what information counsel might have uncovered in his investigation, Landrigan would have interrupted and refused to allow his counsel to present any such evidence. Accordingly, the District Court could conclude that because of his established recalcitrance, Landrigan could not demonstrate prejudice under *Strickland* even if granted an evidentiary hearing." (*Id*. at p. 477.)

Under *Schriro*, a defendant's affirmative decision not to present any mitigating evidence, once established as a factual matter, is dispositive under *Strickland*. "[T]he *Schriro* rule 'follows naturally from *Strickland*'s formulation of the prejudice prong, for there cannot be a reasonable probability of a different result if the defendant would have refused to permit the introduction of mitigation evidence in any event.' [Citations.]" (*Allen v. Secretary, Florida Dept. of Corrections* (11th Cir. 2010) 611 F.3d 740, 762-763 (*Allen*).) Thus, under *Schriro*, "counsel does not render ineffective assistance by complying with his client's express wishes not to present mitigating evidence." (*Cowans*

29

*v. Bagley* (S.D. Ohio 2008) 624 F.Supp.2d 709, 769; see *Owens v. Guida* (6th Cir. 2008) 549 F.3d 399, 406 ["a client who interferes with her attorney's attempts to present mitigating evidence cannot then claim prejudice based on the attorney's failure to present that evidence"]; *Cox v. Del Papa* (9th Cir. 2008) 542 F.3d 669, 683 [applying *Schriro* where the defendant "had continuously—and strenuously—protested when counsel suggested [at sentencing] that his behavior was the result of drug use"]; *Taylor v. Horn* (3d Cir. 2007) 504 F.3d 416, 455 (*Taylor*) ["whatever counsel could have uncovered, Taylor would not have permitted any witnesses to testify, and was therefore not prejudiced by any inadequacy in counsel's investigation or decision not to present mitigation evidence"].)

Here, defendant affirmatively decided not to argue for mitigation. Defense counsel made a record that he had investigated the case in mitigation and discussed it with his client. The trial court confirmed with defendant that he had discussed the decision with counsel, and was aware that the failure to challenge the People's aggravating evidence would make a death verdict more likely. Defendant confirmed his preference for the death penalty, saying he had been considering the decision since shortly after being charged four years previously. In light of defendant's clear and unambiguous choice, defense counsel was not ineffective for acceding to defendant's choice.

Defendant urges his case is distinguishable from *Lang* and *Bloom*. He claims his decision to not present mitigating evidence was "*induced by* antecedent claims of ineffectiveness within the meaning of the specific holding of *Lang* (i.e., counsel's ignorance of the law resulting in his mistaken belief that he was required to slavishly follow the client's demands)." This claim makes little sense. Restated, defendant is suggesting his decision not to present mitigating evidence was induced by counsel's belief that counsel had to comply with the decision.

30

Defendant quotes from the commentary to American Bar Association's (ABA) Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, guideline 10.5, which states in a section entitled "Counsel's Duties Respecting Uncooperative Clients," "It is ineffective assistance for counsel to simply acquiesce to such wishes [to be executed], which usually reflect the distorting effects of overwhelming feelings of guilt and despair rather than a rational decision." (ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev. ed., Feb. 2003), guideline 10.5, Relationship with the Client, p. 71.) First, these guidelines are far from binding precedent. Second, importantly, defendant takes this quote out of context. The commentary further states that counsel "should initially try to identify the source of the client's hopelessness," and members of the defense team should be available to speak to the defendant. (*Ibid.*) The commentary also suggests that "family, friends, or clergy," as well as other inmates, might be enlisted to speak to the defendant, and counsel should tell the defendant that forgoing the presentation of mitigating evidence will not make it more likely that he would prevail on appeal. (*Ibid.*) The commentary concludes: "Counsel in any event should be familiar enough with the client's mental condition to make a reasoned decision—fully documented, for the benefit of actors at later stages of the case—whether to assert the position that the client is not competent to waive further proceedings." (*Id.* at p. 72.) This record demonstrates that counsel here heeded the commentary.

In context, the statement that it is "ineffective assistance for counsel to *simply acquiesce*" in a client's desire to seek the death penalty is consistent with *Lang* and its progeny. The commentary to the guideline at issue does nothing more than advise counsel of the duty to ensure the client is making a competent, informed decision. As noted, part of that duty involves investigating the case in mitigation and discussing the evidence with the defendant. If counsel suspects a preference for the death penalty results from a temporary condition or a mental health issue, counsel should examine the

31

matter further.  Indeed, the commentary's statement that counsel should be familiar enough with the client's mental condition "to assert the position that the client is not competent to waive further proceedings," presumes that if a client *is* competent to do so, counsel does not act unprofessionally by acting in conformity with the client's choice.

Nothing in the record here suggests defendant's choice was due to any temporary condition or mental impairment.  Counsel expressed his belief that defendant was making an informed decision.  Defendant assured the court that he was not suffering from any condition that would impair his ability to think clearly, and related he had been contemplating the decision for almost four years.  Defendant makes no claim that counsel failed to adequately investigate his case or discuss with him the potential mitigating evidence.  In light of this record, defendant cannot establish ineffective assistance.

Defendant argues as a separate claim that his counsel was ineffective because counsel did not question "on an ongoing basis" whether his decision to not present mitigating evidence was "motivated by anger or frustration at the guilty verdict."  He asserts that his penalty phase testimony professing innocence and his desire to absent himself from the penalty phase trial should have indicated that his decision was the product of anger over the guilt phase verdicts rather than of rational thought.

Initially, "it is not irrational to prefer the death penalty to life imprisonment without parole." (*Bloom, supra,* 48 Cal.3d at p. 1222.)  In *People v. Guzman* (1988) 45 Cal.3d 915 (overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13), we rejected a claim that the defendant was mentally incompetent because he preferred the death penalty:  "[I]t cannot be said that his mental competency was brought into question merely because he chose death over another 30 or 40 years in prison, with virtually no hope of ever being free again." (*Guzman*, at p. 964.)  A preference for the death penalty over life in prison is not inconsistent with a claim of innocence, and fails to suggest that defendant's decision was not knowingly and voluntarily made.

A desire to absent himself from the penalty phase likewise does not call into question the rationality of defendant's decision. Defendant could reasonably conclude his presence would not aid his case. Further, his absence meant he did not have to listen to the aggravating evidence against him.

Finally, defendant contends counsel's conduct in arguing for a death sentence constituted a denial of counsel at a critical stage of trial, requiring automatic reversal of the death judgment. He relies upon *United States v. Cronic* (1984) 466 U.S. 648, which stated that "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." (*Id.* at p. 659.) However, *Cronic* described a situation where "the process loses its character as a confrontation between adversaries. . . ." (*Id.* at pp. 656-657.) The United States Supreme Court later clarified: "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete." (*Bell v. Cone* (2002) 535 U.S. 685, 696-697.) As we have stated in rejecting reliance upon *Cronic*: "Defendants have been relieved of the obligation to show prejudice [under *Cronic*] only where counsel was either totally absent or was prevented from assisting the defendant at a critical stage. Neither factor is present here. In other circumstances, the petitioner must show how specific errors undermined the reliability of the verdict. [Citations.] Therefore, while petitioner argues that he is entitled to relief without a showing of prejudice, we conclude that he must satisfy the standards established in *Strickland v. Washington, supra,* 466 U.S. 668." (*In re Visciotti* (1996) 14 Cal.4th 325, 353.)

*Schriro*, *Lang*, and their progeny applied the *Strickland* standard, requiring demonstration of prejudice. (See *Schriro, supra,* 550 U.S. at pp. 475-481; *Lang, supra,* 49 Cal.3d at pp. 1031-1033; *In re Avena, supra,* 12 Cal.4th at p. 732; see also *Williams, supra,* 44 Cal.3d at pp. 1152-1153.) None of these cases suggested that counsel's

33

conduct in conformity with his client's decision could constitute a complete denial of counsel and obviate any showing of prejudice.

The record here is unambiguous. Defendant decided not to argue mitigation or to challenge the prosecution's evidence. By acting in conformity with defendant's desires, counsel provided defendant with exactly the type of representation he wanted, and to which he is entitled by loyal and responsible counsel.

2. Defendant's Waiver

As a separate claim, defendant argues the court erred by accepting his waiver. He contends that his testimony at the penalty trial proclaiming his innocence was inconsistent with an unequivocal desire to not present mitigating evidence, and the trial court "at the very least, should have been querulous [*sic*] when counsel advised that [defendant] wanted the death penalty yet intended to take the stand and proclaim his innocence in the present case and in the uncharged offenses."

Initially, contrary to defendant's suggestion, defense counsel never told the trial court that defendant would testify and claim innocence. Counsel stated only that defendant would testify to "inform the jury that he wants to receive the death penalty." Later, after the trial court had already questioned defendant and found he knowingly and intelligently waived his right to present mitigation, defense counsel stated in passing that defendant "maintains to this day that he's not guilty" *of attacking Margaret Allen*. Finally, just before the penalty phase, defense counsel confirmed that defendant would testify, but made no mention of what he would say. Nothing in these pre-penalty-trial proceedings would have informed the trial court that defendant planned to testify and claim innocence. In any event, as discussed, a claim of innocence is not inconsistent with a preference for the death penalty over life in prison. The former casts no doubt on the latter.

Based upon the circumstances described, the record reflects defendant knowingly and intelligently waived his right to present mitigating evidence. Defense counsel

34

explained at length defendant's desire and indicated they discussed what mitigating evidence was available. The court questioned defendant at length regarding his choice, informing him that the failure to present mitigating evidence would aid the prosecution in obtaining a death verdict. Defendant reiterated that he would "rather do a death sentence than do life without," and he had been "thinking about this since 1992." Defense counsel concurred that he believed defendant was making an "informed choice." Under these circumstances, the court did not err in finding defendant had made a knowing and intelligent waiver of his right to present mitigation and accepting his waiver. (See *Allen, supra,* 611 F.3d at pp. 764-765 [finding the defendant made a knowing and intelligent waiver of his right to present mitigating evidence]; *Taylor, supra,* 504 F.3d at pp. 455-456 [same].)

3. Defendant's Voluntary Absence During Trial

Defendant contends he was denied his constitutional rights to confrontation, due process, freedom from cruel and unusual punishment, and a reliable death verdict, because the trial court permitted his absence during the penalty phase trial. The trial court questioned defendant at length about his desire and defendant confirmed his wishes. The court told him it would instruct the jury that defendant "made an informed decision not to be present" and the jury should not "consider that factor in any way." Even so, it cautioned that his absence "could very likely result in them subjectively considering that, even though they're not supposed to under the law." Defendant stated he understood. Told that the holding cell could receive the audio of the proceedings, defendant declined the court's offer. Finally, the court stated if defendant changed his mind at any time, he could be brought back to the courtroom. Defendant again indicated he understood.

Defendant argues that because he had no right to absent himself, the trial court violated his constitutional rights by allowing him to do so. Although he cites no authority on the point, defendant appears correct that he had no *statutory* right to absent himself from the penalty trial. Penal Code section 1043, subdivision (a) states that "the defendant

35

in a felony case shall be personally present at trial" except as otherwise provided. Penal Code section 1043, subdivision (b) states that a trial started in a defendant's presence may continue in his absence if, under subdivision (b)(1), a defendant is removed for "disruptive behavior," or, under subdivision (b)(2), in "[a]ny prosecution for an offense *which is not punishable by death* in which the defendant is voluntarily absent." (Italics added.)

Penal Code section 977, subdivision (b)(1) provides that a defendant charged with a felony "shall be present at the arraignment, at the time of plea, during the preliminary hearing, *during those portions of the trial when evidence is taken before the trier of fact*, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present, as provided by paragraph (2)." (Italics added.) Penal Code section 977, subdivision (b)(2) provides language that may be used for a written waiver of presence.

"[W]hen read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions: (1) when he has been removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1)." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1210 (*Jackson*); see also *People v. Davis* (2005) 36 Cal.4th 510, 531.) Under these provisions, defendant could not have properly absented himself from the evidentiary portion of the penalty trial. Penal Code section 1043, subdivision (b)(2) "bars a defendant in a capital case from being voluntarily absent from trial." (*People v. Harris* (2008) 43 Cal.4th 1269, 1306, fn. 15.) Even assuming defendant could have executed a written waiver of presence under Penal Code section 977, subdivision (b), he did not do so here. Thus, the trial court committed statutory error by conducting the penalty phase in defendant's absence. (*Davis,* at p. 531; *Jackson,* at p. 1210.)

36

Notwithstanding the statutory violation, defendant cannot show error of constitutional dimension. "A defendant has the right, under the Sixth Amendment of the federal Constitution, to be present at trial during the taking of evidence. Nonetheless, as a matter of both federal and state constitutional law, a capital defendant may validly waive his presence at critical stages of the trial. [Citations.] Defendant's waiver was valid; accordingly, his constitutional rights were not violated." (*People v. Dickey* (2005) 35 Cal.4th 884, 923.) Defendant suggests in passing that his waiver of presence resulted from "pique, frustration and anger at the jury's guilty verdict." The record belies this claim. The trial court questioned defendant at length regarding his decision. He had considered his decision for almost four years, long before the guilt phase and its resultant verdict. The court made defendant aware of the possible consequences of absenting himself. The court also informed him that he could listen to the proceedings in the holding cell or change his mind at any time. Defendant availed himself of neither option. There is no doubt on this record that defendant's waiver of his right to be present was voluntary and knowingly and intelligently made. As such, his absence did not violate the federal Constitution.[12] (See *Young, supra,* 34 Cal.4th at p. 1213; *People v. Weaver* (2001) 26 Cal.4th 876, 966-967; *Jackson, supra,* 13 Cal.4th at pp. 1209-1210.)

4. Claims Against the Death Penalty Law

Defendant raises numerous constitutional challenges to the death penalty law and related jury instructions. He acknowledges we have previously rejected these arguments but urges us to reconsider. He presents no compelling reason to do so.

The death penalty law "adequately narrows the category of death-eligible defendants and is not impermissibly overbroad, thus conforming to the requirements of the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution." (*People v. Whalen* (2013) 56 Cal.4th 1, 90; accord, *People v. Homick* (2012) 55 Cal.4th

---

**12**      Defendant makes no claim of state law error.

816, 903; *People v. Tully* (2012) 54 Cal.4th 952, 1067.)  "Section 190.3, factor (a) (circumstances of the crime) is not applied too broadly and does not result in the arbitrary and capricious imposition of the death penalty."  (*People v. Rountree* (2013) 56 Cal.4th 823, 862; see *People v. Linton* (2013) 56 Cal.4th 1146, 1214-1215; *People v. Lopez* (2013) 56 Cal.4th 1028, 1084.)  "CALJIC No. 8.88's statement that jurors may impose a death sentence only if the aggravating factors are 'so substantial' in comparison with the mitigating circumstances that death is warranted is not unconstitutionally vague." (*Linton,* at p. 1211; accord, *Lopez,* at p. 1083; *Whalen,* at p. 89.)  "The use of the words ' "extreme" ' in section 190.3, factors (d) and (g), and ' "substantial" ' in factor (g), does not act as a barrier to the consideration of mitigating evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments."  (*Linton,* at p. 1216; accord, *Whalen,* at pp. 85-86; *People v. Lightsey* (2012) 54 Cal.4th 668, 731-732.)  "The court need not delete inapplicable sentencing factors or instruct that statutory mitigating factors are relevant solely in mitigation."  (*Rountree,* at p. 863; *People v. Streeter* (2012) 54 Cal.4th 205, 268; *People v. Livingston* (2012) 53 Cal.4th 1145, 1180.)  " 'The California death penalty scheme is not constitutionally defective because it fails to require jury unanimity on the existence of aggravating factors, or because it fails to require proof beyond a reasonable doubt that death is the appropriate penalty, that aggravating factors exist, or that aggravating factors outweigh mitigating factors.' "  (*Lopez,* at p. 1083; see *Linton,* at p. 1215; *Rountree,* at p. 862.)  "The lack of written or other specific findings by the jury regarding aggravating factors did not deprive defendant of his federal due process and Eighth Amendment rights to meaningful appellate review, violate equal protection of the laws or violate defendant's Sixth Amendment right to trial by jury."  (*Linton,* at p. 1216; accord, *Homick,* at p. 903; *Jones, supra,* 54 Cal.4th at p. 86.)  "Because the penalty decision is inherently normative, not factual, there is no requirement the jury be instructed regarding the existence or absence of a burden of proof regarding its determination of the appropriate sentence."  (*Lightsey,* at p. 731; see *Linton,* at p. 1215;

38

*People v. Watkins* (2012) 55 Cal.4th 999, 1034.) "Finally, because 'California does not employ the death penalty as a " 'regular punishment for substantial numbers of crimes,' " ' its imposition does not violate international norms of decency rendering it violative of the Eighth Amendment." (*Whalen,* at p. 92; accord, *People v. Duenas* (2012) 55 Cal.4th 1, 28; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1365.)

## III.  DISPOSITION

The judgment is affirmed in its entirety.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**KENNARD, J.**  *

_____

\*      Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Brown
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S052374
**Date Filed:** June 2, 2014
_____

**Court:** Superior
**County:** Tulare
**Judge:** Joseph A. Kalashian


_____

**Counsel:**

Emry J. Allen, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, William K. Kim and Kathleen A. McKenna, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Emry J. Allen
5050 Laguna Boulevard, Suite 112
PMB 336
Elk Grove, CA 95758
(916) 691-4118

Kathleen A. McKenna
Deputy Attorney General
2550 Mariposa Mall, Room 5090
Fresno, CA 93721
(559) 477-1670