Filed 7/25/16  P. v. Shanks CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062488 |
| v. | (Super.Ct.No. RIF1301488 & RIF1304534) |
| KAREN DIANA SHANKS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard Todd Fields, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor, and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

1

At trial, the prosecution presented evidence that defendant and appellant Karen Diana Shanks and her two codefendants, Johnny Villareal and Juan Garcia kidnapped, assaulted, and robbed a woman they believed owed them money. The jury convicted Shanks of kidnapping (Pen. Code, § 207) and the trial court placed her on probation for three years. On appeal, Shanks argues her kidnapping conviction should be reversed for insufficient evidence. Finding substantial evidence to support the conviction, we affirm.

I

**FACTS AND PROCEDURAL BACKGROUND**

A.    *The Charges*

The Riverside County District Attorney charged Shanks, Villareal, and Garcia of kidnapping to commit robbery (§ 209)[1] and simple kidnapping (§ 207) (counts 1, 2). The district attorney also charged Shanks and Villareal with robbery (§ 211; count 3) and Villareal and Garcia with aggravated assault (§ 245, subd. (a)(4); count 4). Shanks was tried jointly with her codefendants.

B.    *The Prosecution's Case*

On direct examination, the victim testified the incident occurred on a weekend in March 2013 when she was spending time with Shanks and Shanks's boyfriend, Johnny Villareal.[2] The victim was addicted to methamphetamine at the time and admitted she

---

[1]  Undesignated statutory references are to the Penal Code.

[2]  Shanks and Villareal have a child together. At the time of the incident, the victim had known the couple for less than a year.

had used the substance at various times that weekend.  By the time of trial, she had been clean for nine months.

On March 16, 2013, the victim was staying at a hotel in Ontario when she received a call from Villareal asking her to "come pick him up."  The victim drove her rental car (Chevy Malibu) to the location in Upland where Villareal was staying, picked up Villareal and Shanks, and took them back to her hotel room where they discussed using the victim's bank account to deposit money.  Shanks had a $6,000 IRS check made out to her cousin, and she wanted the victim to deposit the check for them.  The victim told the couple that her bank would reject the check because it was made out to a third party, but Villareal and Shanks wanted to make the deposit, so the group drove to a grocery store in Eastvale and Shanks accompanied the victim to the ATM inside.  The victim deposited the check and also withdrew $300.  Over the next couple days the three "just kick[ed] back" in hotel rooms,[3] waiting for the check to clear.  The victim took methamphetamine at least once.

On March 18, the group moved to the Red Roof Inn in Riverside and the victim decided to visit her two sons who were in Jurupa Valley with their father.  About an hour into her visit, the victim received an alert from her phone's banking application indicating money had been withdrawn from her account.  She could not find her ATM card in her purse so she called Villareal to ask if he had taken it.  Villareal told her they would

---

[3] The group changed hotels twice while waiting for the deposit to register in the victim's account.

discuss the matter when she returned to the hotel. When she arrived back at the hotel, Villareal told her "not to worry" about the withdrawal and asked for her car keys. She ultimately complied because she was scared of him. He was yelling, cursing, and being "aggressive." When Villareal left the room, the victim asked Shanks what was happening. Shanks said, "Just calm down. It will be over soon." Around this time the victim called her bank and reported her ATM card as stolen.

Villareal was angry when he returned to the room and accused the victim of trying to keep the check proceeds for herself. The victim tried to explain to him that the bank had rejected the check and she did not have the money. He took the victim's phone out of her hand and told her not to leave the room. She took methamphetamine and eventually fell asleep.

Later that night, codefendant Juan Garcia arrived at the hotel room with a female friend who used the name "Jenny." The victim knew Garcia because he dated her cousin, Jay Lee. At one point, the victim used the restroom and came out to find Villareal and Shanks had left in her Chevy Malibu. She became upset because the couple had her car, keys, and phone. Garcia thought he might know where they had taken her car. The victim, Jenny, and Garcia got into his Dodge Durango and drove around for about two hours, until Garcia pulled up next to a house with a trailer on Avon Street in Jurupa Valley (Avon Street location). By this time it was daylight and the victim could see her Chevy Malibu next to the trailer. As Garcia parked, Villareal walked up to the Durango, opened the door next to where the victim was sitting and started punching her in the face.

4

He took her purse and about $300 cash and some methamphetamine out of her pockets. After saying something to Garcia the victim could not hear, Villareal got into the passenger seat of the Chevy Malibu and Shanks drove off. Garcia followed the couple. As he drove, the victim tried to get out of the Durango, but the door locks had been removed. She was in pain and feared for her life. She screamed at Garcia over the blaring music, but he ignored her.

The group drove caravan style to a different hotel in Riverside, the Quality Inn. Shanks went into the front office and rented a room. As Shanks led everyone to the room, the victim tried to walk away but Garcia grabbed her arm and told her not to "make a scene." Inside the room, Villareal ordered the victim to sit on the bed and told Shanks to wait in the bathroom. The victim had "no idea why" Shanks went into the bathroom, but she described Shanks as being "aggressive" towards her.

The victim heard Villareal speak to Garcia in Spanish, which she could not understand, and she began to fear she would be killed in the hotel room. After talking with Garcia, Villareal opened the bathroom door and left with Shanks. The victim asked what was happening and Garcia replied he did not know what Villareal and Shanks were doing. Garcia refused to let her leave the room. She tried calling the front office for help, but Garcia told her to hang up, threatening "Do you want me to call [Villareal] back down here?" When the front office answered, the victim asked for towels instead of help.

About an hour later, the couple returned to the hotel room. Villareal was angry with the victim and told her he was going to take her to the bank to withdraw more

5

money from her account. Realizing someone at the bank might be able to help her escape because she had reported her ATM card stolen, the victim agreed to go to the bank with them.

Villareal walked the victim to where the cars were parked. Once again the group drove caravan style, with Shanks driving the Chevy Malibu (Villareal was in the passenger seat) and the rest following in the Durango. The victim cried during the drive; her face hurt and was swollen where Villareal had punched her. Instead of going to the bank, Shanks took the group back to the Avon Street location. The victim devised a plan to escape. She would ask to use the bathroom and, when alone, try to make a run for the street.

Garcia let the victim out of the Durango and Villareal walked her to the trailer. Shanks was inside the trailer, sitting on a couch and "rummaging" through the victim's purse while laughing. The victim told Villareal she needed a tampon and Villareal told her to ask Shanks, who handed the victim a tampon from the victim's purse. The victim went to the bathroom, threw the tampon on the floor and walked back out. As she walked through the kitchen on her way out of the trailer, she saw Shanks was still looking through her purse. The victim's trial testimony did not establish whether Shanks noticed her trying to escape.

The victim passed Villareal and Garcia on her way to the street and when they saw her she started to run. Garcia chased after her on foot and eventually caught up to her and grabbed her by the hair. Villareal pulled up next to them in the Chevy Malibu and

6

Garcia got into the car and tried to pull the victim inside with him. The victim began screaming, "Help me, help me. Call 9-1-1!" Villareal started driving and Garcia would not let go of the victim's hair. She was dragged by her hair for several feet until her hair "rip[ped] free" and she fell to her knees on the street. Villareal drove off and the victim ran into a nearby lot and hid under a car.

Tamara Morrison happened to be driving down the same street and witnessed the struggle. Morrison testified she saw the victim being pulled from a car and heard her hysterical screams for help. As Morrison called the police for help, Shanks walked up to her and said, "Don't worry about it. She's fine. She's just drunk." Morrison responded there was nothing "fine" about being dragged by a car. Morrison watched as the victim was dragged about "a house length" down the road and then somehow "broke loose." The victim ran off and disappeared through a fence behind a nearby market, and Morrison told the police dispatcher what she had seen.

The victim testified she saw the police arrive from her hiding spot but did not approach them because "I had a warrant for my arrest."[4] Instead, she walked the short distance back to her sons' father's house. The father opened the door and asked what was wrong. Her face was swollen, she had a cut above her eye, and scrapes on her knees. Later that night, she decided to call the police and report the incident.

---

**4** The victim had a felony drug conviction and was on probation at the time of the incident. She also had two convictions for grand theft of access cards.

On the second day of direct examination, the victim testified Villareal had threatened her when they were being transported from custody to the courthouse that morning.[5] According to the victim, Villareal told her, "You'll get yours. Karma's a bitch." She testified she was afraid Villareal would try to "get me" for testifying against him.

To corroborate the victim's testimony, the prosecution produced a bank statement reflecting she had deposited a third-party check into her account, and had also made a withdrawal, on March 18, 2013. This statement matched the transactions depicted in a surveillance video from the same date and location, showing the victim and Shanks standing at the ATM. The prosecution also produced bank records reflecting the victim had reported her ATM card stolen on March 19, 2013. The manager of the Quality Inn where the victim was taken testified Shanks had checked into his hotel on March 19, 2013 and checked out the following day.

C.   *Defense Case*

Shanks did not testify or call any witnesses. On cross-examination of the victim, the defense attorneys elicited inconsistencies among the descriptions of the incident she gave during trial, the preliminary hearing, and police interviews.[6] Defense counsel also asked questions about the victim's criminal record, history of drug addiction, and

---

[5] The victim was in custody at the time of trial for one of her theft offenses.

[6] The inconsistency Shanks cites to in her brief is that the victim testified Garcia removed the door lock knobs so she could not escape his Durango, whereas during her police interview she said it was Villareal who did so.

substance abuse during the incident.  The victim admitted she took methamphetamine and drank alcohol at times during the incident, but denied her substance use had impaired her memory.  She conceded she had forgotten "a little of the minor details" because the incident had "happened so long ago."  But on the third day of trial, her demeanor changed.  She claimed she could not remember anything she had testified about the previous day, insisted she could not "separate what is real and not real," and stated she had hallucinated during the incident.  She tried to leave the stand, exclaiming "I can't do this, I'm done," but the court instructed her to continue answering counsels' questions, at which point most of her answers became "I don't know" or "I don't remember."  On redirect, she denied she had been threatened again, but admitted she was afraid of what was going to happen to her once she was out of custody.

At the close of the prosecution's case, the court granted Shanks's motion to dismiss the robbery charge against her under section 1118.1.  The jury found her guilty of kidnapping and found Villareal and Garcia guilty of kidnapping and aggravated assault. The jury acquitted Shanks of kidnapping to commit robbery and hung on the remaining charges against Villareal (kidnapping to commit robbery, robbery) and Garcia (kidnapping to commit robbery).  The court refused to accept the kidnapping verdicts against Villareal and Garcia because the charge had been presented to the jury as a lesser included offense of kidnapping to commit robbery and the jury had not been able to unanimously find Villareal and Garcia not guilty of that greater offense.

9

## II

## DISCUSSION

Shanks argues there is insufficient evidence to support the findings that (1) the victim was kidnapped and (2) Shanks aided and abetted the kidnapping. Based on our review of the trial record, there is substantial evidence to support both findings.[7]

A defendant violates section 207 and commits kidnapping when he or she unlawfully moves someone a substantial distance without that person's consent through means of force or fear. (§ 207, subd. (a); *People v. Bell* (2009) 179 Cal.App.4th 428, 435.) Principals in a crime include those who "directly commit the act constituting the offense, or aid and abet in its commission." (§ 31.) A defendant is guilty of a crime as an aider and abettor if: (1) the direct perpetrator committed a crime; (2) the defendant knew of the direct perpetrator's unlawful intent and intended to assist in the crime; and (3) the defendant engaged in conduct that in fact assisted in the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) The test for aiding and abetting liability is "whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures." (*People v. Villa* (1957) 156 Cal.App.2d 128, 134; accord, *People v. Lee* (2003) 31 Cal.4th 613, 623.) The trial court properly instructed the jury on these points of law, and the prosecutor argued Villareal was the direct perpetrator of the kidnapping, and Garcia and Shanks were "aiders and abettors."

---

[7] Because we conclude substantial evidence supports Shanks's conviction as an aider and abettor of the kidnapping, we need not address her argument that insufficient evidence supports liability on the basis of a conspiracy.

10

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' " [Citations.] " 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 105-106 (*Brown*).)

Here, the victim testified she was held against her will for a substantial period of time, during which she was beaten and transported to various locations. She tried to escape at least four times, but escape was difficult because Villareal had taken away her car, purse, and phone. After Villareal punched her in the face, she tried to flee Garcia's Durango but the door locks had been removed. When the group reached the Quality Inn, she again tried to flee but Garcia grabbed her by the arm and told her not to make a scene.

11

Inside the hotel room, she tried to ask the front office for help but this attempt was also stymied by Garcia, who threatened to call Villareal back into the room. The victim's final attempt to escape ultimately was successful, but resulted in her being dragged by her hair from a moving car for several feet. Based on this testimony, the jury could reasonably find that Villareal and Garcia detained and transported the victim against her will by means of force and scare tactics.

Regarding Shanks's role in the kidnapping, the record supports a finding that she played an integral part in keeping the victim detained. The victim testified Shanks was present for most of the incident, drove Villareal to every location, and rented the room where they kept her for over an hour as she feared for her life. Morrison, who witnessed Garcia and Villareal dragging the victim down the street by her hair, testified Shanks had approached her and tried to minimize the situation. This evidence supports a finding that Shanks was aware of her boyfriend's intention to detain and transport the victim against her will and took affirmative steps to assist him in that plan.

On appeal, Shanks contends there is insufficient evidence to find the victim was kidnapped because the victim was an unreliable witness whose account of the incident could not be believed. Under a substantial evidence review the "testimony of a single witness is sufficient to support a conviction," unless the testimony is "physically impossible or inherently improbable." (*Brown*, *supra*, 59 Cal.4th at p. 106.) Far from being impossible or improbable, the victim's testimony on direct examination was lucid, detailed, and corroborated by other sources. The bank records and surveillance video

12

corroborate her description of the trip to the ATM with Villareal and Shanks and her testimony about reporting her ATM card as stolen; the testimony from the Quality Inn manager corroborates her testimony that Shanks rented the hotel room; and Morrison's testimony corroborates her description of her escape.

Shanks makes much of the victim's recanting testimony on cross-examination; however, we do not reweigh the evidence or assess credibility on review. "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*Brown*, *supra*, 59 Cal.4th at p. 106.) The victim testified Villareal had threatened her just before she took the stand on the second day of trial. She also testified she remembered all but a few minor details about the incident. The jury was free to accept this testimony as more credible than her subsequent attempt to discredit her description of the incident wholesale by claiming hallucination, memory loss, and illness. A reasonable jury could readily dismiss her recanting as a reaction to fearing Villareal's threatened retribution for testifying against him[8] or, as the prosecution argued during closing, as the result of being overwhelmed and fatigued. The same can be said of the inconsistencies in the victim's description of the incident at trial, during the preliminary hearing, and during police interviews. The jury was free to believe the victim's direct testimony and

---

[8] It is does not matter under substantial evidence review that the officer who was transporting the victim from custody did not hear Villareal threaten the victim. The jury was free to believe the victim's testimony without corroboration from another witness. (*Brown*, *supra*, 59 Cal.4th at p. 106.)

13

disregard any conflicts as mistakes or less credible descriptions. As the reviewing court, we must assume the jury resolved all conflicting inferences in favor of the verdict. (*Ibid.*)

Next, Shanks contends the evidence does not support a finding the victim was kidnapped because it is "more likely" she voluntarily consented to hang out with the group "in the hopes of being able to ingest more methamphetamine" and because she may have been in "some type of romantic relationship" with Garcia.[9] In so speculating, Shanks ignores the rule that the jury's verdict " 'may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*Brown*, *supra*, 59 Cal.4th at p. 106.) We may reverse for insufficient evidence only when there is " 'no hypothesis whatever' " to support the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The record contains evidence the victim tried to escape her captors at least four times. The jury could reasonably conclude that after her first attempt to escape (in the Durango when she realized the door locks had been removed), the victim was no longer voluntarily spending time with the group.

In the alternative, Shanks's attempts to downplay her own role in the kidnapping by pointing out she never physically transported the victim or prevented her from leaving during the four-day incident, was not present when Villareal punched the victim in the face, and was told to sit in the bathroom when the group arrived at the Quality Inn. Shanks argues "[t]he fact that Villareal had [her] go into the bathroom before he spoke to

---

[9] A friend of Garcia's testified he had seen Garcia and the victim acting "lovey-dovey" with one another prior to the incident.

Garcia strongly suggests [she] was not privy to the plans or actions of Villareal and Garcia with regard to [the victim]." We find Shanks's argument unpersuasive. Guilt under an aiding and abetting theory does not require knowledge of the direct perpetrator's exact plans or a formal agreement to commit the offense. (*People v. Morante* (1999) 20 Cal.4th 403, 433.) Knowledge of the direct perpetrator's unlawful intent and "assistance in committing the offense" is sufficient. (*Ibid.*)

Based on the victim's account of the incident, it is difficult to imagine Shanks was oblivious to her boyfriend's unlawful plan to hold and transport the victim. Whether or not she witnessed Villareal punch the victim in the face, she was with the victim at the Quality Inn immediately after the beating, by which point the victim's face was swollen and she was in significant pain. She did not need to see Villareal beat the victim or Garcia stop her from escaping to appreciate that the victim was being held against her will. The jury could reasonably infer that Shanks perceived from the victim's swollen, tear-stained face, and terrified demeanor that she wanted to be released.

In any event, even if the jury believed Shanks was oblivious to her boyfriend's kidnapping plan as the group led the victim from one location to another, once the jury learned she saw the victim being dragged from the Chevy Malibu by her hair, it could reasonably infer she was aware of Villareal's unlawful intentions. The jury could also infer that, by approaching Morrison and downplaying the struggle between the victim and her captors, she was trying to help Villareal and Garcia commit and conceal the kidnapping. We reject Shanks's contention the kidnapping was already completed by the

15

time she talked to Morrison.  To the contrary, the crime was still in progress and, if Shanks had been successful in dissuading Morrison from calling the police and convincing her to drive away, the kidnapping would have continued.

By focusing on the things she did *not* do during the incident, Shanks misapprehends aider and abettor liability.  Under this theory of liability, we must affirm the conviction if there is substantial evidence to support a finding that she knew Villareal intended to detain and transport the victim against her will and that she in some way assisted him in doing so.  The record contains substantial evidence to support both findings.

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

RAMIREZ
P. J.

HOLLENHORST
J.

16