Filed 11/20/23  P. v. Lenard CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B324751 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA081299) |
| v. | |
| ROBERT ERIC LENARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert G. Chu, Judge.  Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In September 2022, appellant Robert Eric Lenard was convicted by a jury of the 1995 murders of Jerek Armstrong and Tyrone Overstreet in Lancaster, California. In May 2021, Lenard had called the Los Angeles Sheriff's Department to confess to these murders. This confession was played for the jury.

Lenard's sole contention on appeal is that the trial court erred in excluding expert testimony he wanted to present regarding the effects of methamphetamine use and sleep-deprivation, which testimony he contends would have supported his argument that he had made a false confession. Because Lenard failed to present to the jury any evidence that he had used methamphetamines or was sleep-deprived at the time of the confession, we hold the court did not err in excluding the evidence. We therefore affirm.[1]

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.    *Confession*

On May 5, 2021, Lenard left his son a voicemail, stating he was drinking and smoking and was "going to hide in the mountains for a couple of days." On May 8, 2021, Lenard left his son another voicemail, claiming that a woman named Shannon Johnson and her daughter were conspiring to kill him for "capital gain," after which they would "take that money and murder y'all"; Lenard was "not gonna let that happen."

---

[1] The parties also dispute whether the exclusion of the expert testimony was harmless. Because we find the court did not err, we do not address this issue.

[2] We limit our summary to the facts and procedural history relevant to the issues raised on appeal.

Also on May 8, Lenard texted the following message to the North Port Police Department in Florida: "I want to use this as official evidence in the event of my demise[.] Shannon [middle name omitted] Johnson [street address omitted] North Port FL[,] dob [date of birth omitted] and her oldest daughter Kiara Johnson age [age omitted] conspired for Capitol gain [*sic*] to have me murder[ed]. North Port has precedence because that[']s where the[y] paid for the contract although the attempts were made on my life in Ba[]ton Rouge [L]ouisiana[,] Beaumont[,] Texas and Lake Charles[,] Louisiana[.] The contractors put a substance in my heater core that makes you fall asleep[.] It hits the air in a gas form but immediately sticks in cold air which driving at night does [*sic*] . I had property of substantial amounts that needed the paperwork corrected and asked Shannon Johnson to help me[.] She claimed the property as her own and put a contract on me[.] [T]he rest of the contract is to be paid out of the claiming of this estate so she needs a death certificate with my name on it."[3] Thirteen minutes later, he sent another text message to the North Port Police Department claiming he had bloodwork done to prove Kiara was not his daughter, that he was headed to North Port to file a complaint against Johnson and her daughter for "fraud conspiracy to commit murder for Capitol gain [*sic*] bank theft and stalking," and that he was currently in Lake Charles, Louisiana where "Kiara[']s real dad call[s] the shots on who gets killed" and "she plans to kill my heirs as well" and "say I left all that to Kiara Johnson."

---

[3] We omit certain identifying details in this text message because they are irrelevant to this appeal.

3

The next day, Lenard called the Los Angeles County Sheriff's Department and confessed to the 1995 murders of Jerek Armstrong and "Polar Bear."[4] He explained that, on the day of the murders, someone had told him Armstrong was going to kill his little brother, and so he walked up to Armstrong and, when Armstrong said, "Hey, PB,"[5] Lenard shot Armstrong, and then shot Polar Bear. Lenard continued that, after the murders, he was picked up by his girlfriend, Shannon Johnson, and Shannon's brother, Kevin. Lenard claimed that Johnson was now trying to kill him. When asked why he was confessing, Lenard first stated it was because he "wasn't with killing no kid, and then they owe me, because I ain't one to follow the track."[6] He also agreed that he was "just trying to get this off [his] chest to clean [him]self a little bit," adding that he had stopped smoking cigarettes and "don't get high no more." He additionally said he was "trying to have my conscience clean before God call me home" and that "[i]f I don't make it to y'all, at least I come clean."[7]

Later that night, after Louisiana law enforcement detained him, Lenard called a woman and explained that because he had "told the law everything," including "her involvement in a double murder," law enforcement would "probably . . . come pick her

[4] During trial, a witness testified that "Polar Bear" was the moniker for Tyrone Overstreet, one of the two victims in this case.

[5] Presumably PB stands for Polar Bear.

[6] Earlier in his call to the Sheriff's Department, he had explained that Johnson was trying to kill him because "I started getting high. And Shannon had ordered a hit on a kid, and I wasn't with that shit" and "[t]hey've been mad at me ever since."

[7] Lenard was in Louisiana when he confessed.

up."[8]  He explained to the woman on the phone:  "I got to save you all" and "I can't let this shit happen to you all."  He also told her that "it's time I get right with god."

## B.    *Pre-Trial*

In December 2021, after a preliminary hearing, Lenard was held to answer for the murders of Armstrong and Overstreet.  In January 2022, he was charged by information with two counts of murder; Lenard pled not guilty.

In September 2022, before trial commenced, Lenard moved to exclude evidence of the confession he made to the Los Angeles County Sheriff's Department, contending it was involuntary.  Specifically, Lenard argued that when he made his statements to the Sheriff's Department, he "was under auditory hallucinations or delusions or paranoia based on the fact that he was under the influence of meth and lack of sleep."  In support of his motion, Lenard submitted a document containing questions posed to Dr. George Elias, a psychiatrist, regarding the effects of methamphetamine use and lack of sleep, and Elias's answers thereto.  The parties stipulated that if Elias were called to testify, he would testify consistently with the answers provided to the court.  The document included a question of what "the

---

[8] Lenard told the woman he was speaking with that "she" was likely to be booked because he had "told of her involvement. Her and Kevin's."  He also stated that he "told them that she was [an] accomplice" and an "accessory after the fact."  From the context of the conversation, and Lenard's earlier statements to the Los Angeles Sheriff's Department that Shannon and her brother Kevin had picked him up after the murders, the "she" and "her" in this conversation appear to refer to Shannon Johnson, not the woman Lenard was speaking with.

combination of meth use and lack of sleep [would] do to a person's ability to make rational decisions" and Elias's answer that "Meth use itself can induce psychosis.  Meth use + sleep deprivation can accelerate and enhance the problem."  The document also included a question about whether "the use of meth and lack of sleep [could] cause a person to believe that they did something even though in reality they didn't" and Elias's answer that "Individuals can hold various false beliefs in the context of a psychotic state, including believing they did something they did not do."  No one asserted, and there is no evidence in the record showing, that Elias ever examined Lenard.

Lenard testified at the hearing that, before he called the Sheriff's Department on May 9, 2021, he had used methamphetamines "for approximately seven or eight days" and that he had not slept between April 31 and May 7, at 3:00 a.m., when he slept for three hours.[9]  Lenard admitted to using methamphetamines "three times a week" since 2000.  The court did not find Lenard's confession to be involuntary, and denied the motion.

Lenard's counsel then asked that statements he made to law enforcement regarding other, uncharged murders be excluded; the court agreed "unless the defendant testifies."

_____

[9] Lenard's counsel then asked, "So, essentially, from May 7th to May 9th of 2021, total hours of sleep you had was three hours?"  Lenard responded, "Yes, sir.  Correct."  It is unclear from the record whether counsel intended to ask whether Lenard had slept for three hours from May 1 to May 9, or whether this was a new area of inquiry as to how much Lenard slept from May 7 to May 9 (when he made the phone call to the Sheriff's Department).

Lenard's counsel stated he was unsure whether Lenard would testify but, if he did, the defense intended to call Elias. The court responded that if Lenard testified, "Dr. Elias's testimony would become relevant at that time, and the court would allow" him to testify in that case.

### C.  *Trial*

A five-day jury trial took place between September 13 and September 19, 2022. Seven witnesses testified for the prosecution; one witness testified for the defense.

Of relevance to this appeal, the police officer who detained Lenard in Louisiana testified that he had been a police officer for ten or eleven years at the time of detention, had been trained on the behavior of individuals under the influence of drugs, and observed nothing in Lenard's behavior to cause him to believe Lenard was under the influence of methamphetamines when detained. A search of Lenard's person at that time also revealed no methamphetamines.

Additionally, one of the police officers who listened to Lenard confess telephonically testified he had been trained to recognize the effects of methamphetamines, had spoken with people high on methamphetamines "several hundred times" in his career, and had never had such a person "just come out of the blue and confess to a murder."

Finally, Lenard's 24-year-old son testified that he received two voicemails from his father on May 5 and May 8, 2021, in which his father sounded "intoxicated," although he did not know on what substance his father may have been intoxicated. Lenard's son testified that he had previously spoken to his father when he was under the influence of "hard drugs," "like methamphetamine, crack cocaine, [or] heroin," and when he

7

heard the two voicemails, he believed his father was under the influence of drugs. When asked what made him believe this, he testified it was because his father said "he was going to hide in the mountains" and because his father "was paranoid." Lenard's son did not otherwise testify about his father's methamphetamine use, and did not testify about his father being sleep-deprived. There was no other testimony from anyone regarding Lenard's methamphetamine use, and no testimony about any sleep-deprivation that Lenard was allegedly suffering from.

Though Lenard chose not to testify, his counsel nevertheless asked the court to permit Elias to testify about "what meth use . . . and lack of sleep does to [a] person's state of mind." Lenard's counsel explained that he intended to use that testimony "to argue that, at the time of the phone call [Lenard made confessing to the murders], Mr. Lenard was under the influence of meth and hadn't slept for eight straight days; and that because of that, he was not acting rationally." The court denied the request, finding Elias's testimony irrelevant because "there's been no evidence presented to the jury that the defendant didn't have any sleep or was using meth for the past eight straight days." After the admission into evidence of the two text messages Lenard sent to the North Port Police Department, the defense rested.

In closing, Lenard's counsel argued that his confession was fabricated, stemming from Lenard's "irrational belief that his life was in danger" and, "with this irrational belief, he thinks that by confessing to things he didn't do, and if he got in police custody, [that] would mean he and his family are safe." His counsel explained that Lenard was "trying to implicate Shannon

8

Johnson," and "trying to get her arrested, taken into custody so that, in his mind, she can't kill his family, his heirs, as he talks about in his text[] messages and in his voicemails." His counsel highlighted perceived discrepancies between Lenard's confession and the physical evidence and suggested alternative channels through which Lenard could have learned how the murders were committed. His counsel pointed out that no physical evidence tied Lenard to the murders and "the only thing that we have is this false confession from a man who was going through something at the time, whether he was under the influence of some kind of a substance, whether he was having a mental breakdown, we don't know."

After the jury began deliberating on the morning of September 19, 2022, they requested a laptop to "listen to the CDs."[10] The court provided them with the requested laptop. Soon thereafter, they reached a verdict, finding Lenard guilty of both counts of first degree murder, and finding true that he used a handgun in the crimes. In October 2022, the court sentenced Lenard to fifty years to life, plus another eight years (for use of a firearm in two felonies), to run consecutively. Lenard timely appealed.

## DISCUSSION

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the

---

[10] All the audio clips presented during trial were on CDs.

9

standard for admissibility is subject to review for abuse of discretion.'" (*People v. Brown* (2014) 59 Cal.4th 86, 101.)[11]

The Evidence Code defines "proffered evidence" as "evidence, the admissibility or inadmissibility of which is dependent upon the existence or nonexistence of a preliminary fact," and provides that "[t]he proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when [¶] . . . [t]he relevance of the proffered evidence depends on the existence of the preliminary fact." (Evid. Code, §§ 401, 403, subd. (a)(1).)

Elias's testimony regarding the effects of methamphetamine use and sleep-deprivation was relevant only if Lenard had presented evidence that he had used methamphetamine and was sleep-deprived. Lenard claims he presented such evidence, citing to: (1) his son's testimony that he had spoken with his father when his father was under the influence of "hard drugs," "like methamphetamine, crack cocaine, [or] heroin," and that in his father's voicemails to him on May 5 and May 8, 2021, his son thought he sounded intoxicated; (2) Lenard's text messages to the North Port Police Department that a substance had been put in his heater core that would make someone fall asleep; and (3) his statement to the Los Angeles

---

[11] Lenard claims that "where a defendant's constitutional rights are affected by the exclusion of relevant evidence, an appellate court applies a de novo standard of review, according the trial court no deference." Because, as discussed herein, we hold the trial court did not exclude relevant evidence, we need not address Lenard's contention.

Sheriff's Department that Johnson was trying to kill him because he "started getting high."[12] We are unpersuaded. At most, this evidence may have supported an inference that Lenard was under the influence of some unknown substance and was experiencing paranoid delusions when he left the voicemails for his son and texted the North Port Police Department. But this evidence did not support an inference that he had been using methamphetamines or was sleep-deprived at all, let alone that he had used methamphetamines or was sleep-deprived in any significant amount. Therefore, Lenard failed to establish the preliminary facts necessary to make relevant Elias's testimony regarding the effects of methamphetamine use and sleep-deprivation, and the trial court did not err in excluding that testimony.[13]

---

[12] We note that in the same call, he also told the Sheriff's Department that he had stopped getting high.

[13] Thus, we find misplaced Lenard's reliance on *People v. Caparaz* (2022) 80 Cal.App.5th 669. In *Caparaz*, the appellate court found the trial court had erred in excluding expert testimony that the defendant was a "highly suggestible individual" and "highly susceptible to giving a false confession under the stress of police interrogation" because such testimony was relevant to whether the defendant's statements to police were reliable. (*Id.* at pp. 681, 684–685.) But in *Caparaz*, there was no dispute that the expert had examined the defendant to determine whether he was "especially susceptible to giving a false confession" and that the defendant had in fact made statements to police. (*Id.* at p. 681.) Here, by contrast, there was no evidence presented to the jury that Lenard was using methamphetamines or was sleep-deprived at the time of his confession.

11

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.