Filed 9/26/24  P. v. Vigeant CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY RED VIGEANT,<br><br>        Defendant and Appellant. | B331638<br><br>(Los Angeles County<br>Super. Ct. No. NA075960) |

APPEAL from an order of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge.  Affirmed.

Law Offices of Michael Clough and Michael W. Clough; Law Offices of Richard L. Sternfeld and Richard L. Sternfeld for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Viet H. Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Anthony Red Vigeant (defendant) appeals the trial court's denial of his petition for relief under Penal Code[1] section 1172.6[2] after an evidentiary hearing. On appeal, defense counsel devotes most of their attention to accusing the trial court of being "confused," "clearly unprepared," slapdash, and dishonest, and to accusing the prosecutor of being "arrogant" and "cavalier." These accusations are unsupported by the record, and hence manifestly inappropriate and unbecoming of officers of the court. Because our independent review of the record indicates that the trial court's underlying ruling is correct, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

I.     Facts[3]

A.     *The underlying crime*

In 2007, defendant and his cousin Trevor Glenn Landers (Landers) were United States Marines stationed at Camp Pendleton Marine Base. In August of that year, they befriended Ramon Hernandez (Hernandez), a fellow Marine who told them about the injuries he had received on his second tour of duty in Iraq. His injuries were significant: He had shrapnel inside his brain. He lost his left eye, his sense of smell, his left frontal lobe

---

1     All further statutory references are to the Penal Code unless otherwise indicated.

2     Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We therefore refer to the law formerly codified at section 1170.95 as section 1172.6.

3     These facts are drawn directly from the trial transcript, which defendant in his reply brief concedes we may consider.

and part of his right frontal lobe. He suffered nerve damage in his right arm and hand. And his brain injuries affected his thinking, causing him to process information more slowly and diminishing his ability to feel empathy toward others.

Soon after meeting Hernandez, defendant and Landers told him that they had a problem with a man named David Pettigrew (Pettigrew). They explained that Landers had agreed to buy cocaine from Pettigrew, who had taken defendant's laptop as security for the upcoming deal, and Pettigrew had yet to produce the cocaine or return the laptop. Pettigrew was a total stranger to Hernandez.

On the night of September 7, 2007, and early the next morning, defendant and Landers called Pettigrew several times in Hernandez's presence. Landers left one message warning Pettigrew that he "better fuckin' call [Landers] back." Defendant left three messages further warning Pettigrew that he "and [his] cousin" (that is, Landers) were "ready to rumble," that Pettigrew was "fucked if [he] tr[ied] to run" because they "kn[e]w where to find [him]," and were "gonna come to [his] house," where it would "get really ugly."

On September 9, 2007, Landers asked defendant to pick him up. Defendant agreed and Hernandez went with him to pick up Landers, who was again complaining about Pettigrew. At one point, Landers stated that, if he had a gun, "he would bust a cap in [Pettigrew's] ass." Hernandez offered up that he had a handgun in his barracks. Upon hearing this, Landers became "excited, very enthusiastic," and asked Hernandez where the gun was located. Defendant and Landers indicated that they wanted Hernandez to get the handgun and shoot Pettigrew.

Because Hernandez's barracks was a 45-minute drive to the south, Landers drove the three of them in defendant's car to retrieve the gun and then turned around and drove two hours north to get to Pettigrew's apartment in Long Beach. During that drive, Hernandez said he did not like that Pettigrew was messing with fellow Marines. He asked defendant and Landers what they wanted him to do. Their response? Shoot Pettigrew. When Hernandez pointed out the difference between being shot and being dead, and asked, "Which one do you want?" Defendant and Landers clarified that they wanted Pettigrew "dead." Defendant indicated at least three times that he wanted Pettigrew killed. Defendant took the gun from Hernandez, "aim[ed] it out the window," "flipp[ed] it around," and "h[ung] it out the passenger side window, aiming at the windshield." In preparation for the confrontation to come, Hernandez loaded the gun and fired it out the car's window.

When they arrived at Pettigrew's apartment, Hernandez again asked defendant to confirm his instructions, "Are you sure this is what you want? . . . If you want this guy dead and he doesn't give you what you want, then I am going to shoot him because you said you want him dead, right?" Defendant responded that he wanted Pettigrew "dead."

Landers climbed a fence to check if they could access Pettigrew's apartment through a window. He came back and told the others they would have to go through the front door. Hernandez did not want to enter the apartment "blind," so Landers drew a "floor plan" for him out of twigs and small rocks.

When the three men entered the apartment, Pettigrew appeared to be asleep or passed out. When he awoke, defendant and Landers yelled, "Where is [the] coke?" and "Where is [the]

computer? Where is my shit?" Pettigrew offered to call his dealer to get the cocaine, but when Pettigrew placed a call with his cell phone, he called *Landers's* phone.

At that point, Hernandez pulled out the gun and stated he would give Pettigrew 10 seconds to produce the cocaine. Defendant did not stop Hernandez or tell him to put the gun away. Instead, defendant and Landers told Pettigrew to call his dealer "and get the coke here right now" because Hernandez "is going to shoot you" "when he makes it to ten." Hernandez counted very slowly, pausing approximately 10 or 15 seconds between each number. When he got to 10, he pulled the trigger and shot Pettigrew from a distance of about four feet.

Rather than checking whether Pettigrew was still alive, all three men fled the apartment, ran to the car, and drove away. In total, the three men were inside of Pettigrew's apartment for "no more than 20 minutes."

Landers drove them back to Camp Pendleton. Once there, they went to Landers's room and "h[u]ng out" for about three more hours drinking. They agreed not to say anything about what happened and to pretend they did not know each other. Defendant and Hernandez returned to their own barracks.

### B. *Charging, conviction, and appeal*

#### 1. *Charges*

In the operative, first amended information, the People charged defendant and Landers with the first degree murder of Pettigrew (§ 187, subd. (a)), attempted home invasion robbery (§§ 664, 211), and first degree residential burglary (§ 459). As to the murder, the People alleged the special circumstance that defendants "were engaged in the attempted commission of the crime of robbery" and "in the commission of the crime of

5

residential burglary." (§ 190.2, subd. (a)(17).) As to all three crimes, the People further alleged that "a principal was armed" during those crimes. (§ 12022, subd. (a).)

2.  *Trial and conviction*

Hernandez ended up pleading to all counts without a plea agreement, but agreed to testify for the prosecution.

The matter proceeded to a joint jury trial against defendant and Landers. The jury convicted defendant of first degree murder, attempted home invasion robbery, and first degree residential burglary. The jury found true the special circumstance allegation and made true findings on the firearm enhancement.

3.  *Sentence*

Defendant was sentenced to an indeterminate term of life without the possibility of parole, plus a determinate term of 66 months in state prison.[4]

4.  *Appeal*

Defendant appealed his conviction, and we affirmed his conviction in an unpublished opinion.

## II.  Procedural Background

On December 7, 2021, defendant filed a petition seeking resentencing under section 1172.6. After a full round of briefing during which defendant and the People cited to the record of conviction used on direct appeal, the court held an evidentiary hearing on May 22, 2023.

At that hearing, the People elected to rely on the record of conviction and did not offer any additional evidence. Defendant also did not introduce any additional evidence and did not

---

[4]  Landers was convicted of the same crimes and received an identical sentence.

6

request a continuance of the hearing to allow witnesses to testify. Instead, defense counsel accused the trial court of conducting a "clearly improper" proceeding, of making "specious" arguments, and of having "predetermined" and "presaged" the outcome. Accepting defense counsel's representation that "the real issue" and "main argument" in defendant's petition was "the inconsistency and weakness of . . . Hernandez's testimony," the court reviewed the "whole" of Hernandez's testimony during the lunch break but otherwise relied on counsel's written summaries of the less critical portions of the trial transcript as being accurate. The court then denied defendant's petition, finding sufficient evidence beyond a reasonable doubt to uphold defendant's murder conviction on two still-valid theories of murder liability—namely, that (1) defendant was a major participant in the burglary and attempted robbery of Pettigrew's residence who acted with reckless indifference to the value of human life, as defined in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), and (2) defendant "direct[ly] aid[ed] and abett[ed]" Hernandez's shooting of Pettigrew by participating in "sort of a conditional conspiracy" to kill Pettigrew if Pettigrew did not produce cocaine, and hence defendant personally acted with the intent to kill.

Defendant filed this timely appeal.

## DISCUSSION

Defendant attacks the trial court's ruling with three categories of arguments: (1) those attacking the ruling, (2) those attacking the trial court, and (3) those attacking the prosecutor. Although defendant devotes very little time to the first category, we will start with that category.

7

I.      **The Substantive Section 1172.6 Ruling**

In 2018, our Legislature amended the definition of "murder" in our state to preclude a jury from "imput[ing]" the "malice" element of that crime "based solely on [a defendant's] participation in a crime."  (§ 188, subd. (a)(3).)  Our Legislature's purpose was to ensure that "[a] person's culpability for murder [is] premised upon that person's own actions and subjective mens rea."  (Stats. 2018, ch. 1015, § 1(g).)  As amended, liability for murder is limited to persons (1) who are the actual killer; (2) who aided and abetted the actual killer in the murder (that is, who acted with the intent to kill); or (3) who were a major participant in the underlying felony that resulted in the killing, but only if they also acted with reckless indifference to human life.  (§§ 188, subd. (a)(3), 189, subd. (e); e.g., *People v. Johns* (2020) 50 Cal.App.5th 46, 58-59.)

Section 1172.6 is the procedural vehicle by which persons convicted in now-final judgments can seek to vacate convictions that do not satisfy the now-current definition of "murder."  Where, as here, a defendant files a facially sufficient petition and the record does not otherwise foreclose relief as a matter of law, the trial court must issue an order to show cause and convene an evidentiary hearing.  (§ 1172.6, subd. (c).)  At the hearing, the People have the burden of proving to the trial court, acting as an independent factfinder, that a defendant is guilty of murder on a still-valid theory.  (§ 1172.6, subd. (d)(3).)

Among other things,[5] the trial court found beyond a

---

[5]    Although the trial court offered a second, independent basis for finding defendant guilty of murder—namely, that he was a direct aider and abettor who acted with the intent to kill—we need only discuss one basis to affirm.

8

reasonable doubt that defendant was guilty under the still-valid theory that he was a major participant in the burglary and robbery that resulted in Pettigrew's death and that he acted with reckless indifference to human life. Our task is to assess whether "substantial evidence"—"that is, evidence that is reasonable, credible, and of solid value"—supports the trial court's independent finding that defendant acted with reckless indifference. (*People v. Nieber* (2022) 82 Cal.App.5th 458, 476.) In so doing, we view the evidence in the light most favorable to the court's finding, drawing all reasonable inferences in support of that finding. (*Ibid.*)

Thus, we turn to examining whether substantial evidence supports the trial court's subsidiary findings that defendant was a major participant in the underlying felony and acted with reckless indifference to human life, as those elements were narrowed under *Banks* and *Clark*.

### A. *Major participant*

Under *Banks* and *Clark*, a "major participant" in a burglary or attempted robbery is someone whose "personal involvement" is "substantial"; such a participant "need not be the ringleader," but his involvement must be "greater than the actions of an ordinary aider and abettor." (*Banks*, *supra*, 61 Cal.4th at p. 802; *People v. Williams* (2015) 61 Cal.4th 1244, 1281.) Courts are to examine the totality of the circumstances when evaluating the extent of participation, including several factors our Supreme Court identified in *Banks* as relevant but not dispositive on the issue: (1) the defendant/aider and abettor's role in planning the burglary and attempted robbery; (2) his role in supplying or using lethal weapons; (3) his awareness of the "particular dangers posed by the nature of the crime, weapons used, or past

9

experience or conduct of the other participants"; (4) his presence at the scene of the killing and thus whether he was "in a position to facilitate or prevent the actual murder"; and (5) his actions after the use of lethal force. (*Banks*, at p. 803; *Clark, supra*, 63 Cal.4th at p. 611.)

Substantial evidence supports the finding that defendant was a major participant, even when applying the heightened standard set forth in *Banks* and *Clark*.

First, defendant played a significant role in planning the attempted robbery/burglary. Defendant had previously left messages to Pettigrew warning that they were "gonna come to [his] house"; defendant's car was used and he drove for part of the time on the day they traveled to Pettigrew's apartment; and he told Hernandez at least three times that he wanted Pettigrew dead.

Second, defendant played a major role in obtaining the weapon used. He recruited Hernandez to get his handgun; he enthusiastically embraced Hernandez's offer to use Hernandez's gun; he saw the gun and heard Hernandez test it while driving to Pettigrew's apartment; and, knowing Hernandez's willingness to follow defendant's instruction to use the gun on Pettigrew, he did nothing to dissuade Hernandez from bringing it into Pettigrew's apartment.

Third, defendant was aware of the particular dangers posed by the nature of the crime and the participants. Hernandez told defendant about his combat history and physical and psychological injuries; the plan involved robbing and burglarizing a drug dealer; defendant knew Hernandez was armed; and defendant repeatedly affirmed that he wanted Pettigrew dead if he and Landers did not get the cocaine. Given that defendant

10

repeatedly stated his plans in front of Hernandez and saw how Hernandez eagerly supported him in those plans and how Hernandez then asked for specific instructions on whether to kill or just maim Pettigrew if Pettigrew did not produce the drugs or laptop, the evidence also supports the inference that defendant was aware that Hernandez was very suggestible.

Fourth, defendant was at the scene of the killing and did not intervene in any way to stop Hernandez from shooting Pettigrew even though he was so close that blood from Pettigrew's head wound almost splattered him.

Fifth and finally, defendant did not render any aid to the victim. Instead, he fled the scene; he stopped to get some food on the drive back to Camp Pendleton; and he "hung out" with his cohorts for a few hours after they got back to base.

### B. *Reckless indifference to human life*

Under *Banks* and *Clark*, a defendant acts with reckless indifference to human life when he "'"knowingly engag[es] in criminal activities known to carry a grave risk of death."'" (*Banks*, *supra*, 61 Cal.4th at p. 801, quoting *People v. Estrada* (1995) 11 Cal.4th 568, 577, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 157-158.) This standard "has a subjective and an objective" component. (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) To satisfy the subjective component, "'[t]he defendant must be aware of and willingly involved in the violent manner in which the [underlying felony] is committed,' and . . . must consciously disregard 'the significant risk of death his or her actions create.'" (*Scoggins*, at p. 677, quoting *Banks*, at p. 801.) The key is whether the defendant evinces "a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the

11

outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) To satisfy the objective component, the risk of death ""must be of such a nature and degree that, considering the nature and purpose of the [defendant's] conduct and the circumstances known to him . . . , its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the [defendant's] situation."" (*Scoggins*, at p. 677, quoting *Clark*, at p. 617.)

Our Supreme Court has identified a number of considerations bearing on whether a defendant has acted with reckless indifference to human life. "No one of these considerations is necessary, nor is any one of them necessarily sufficient" (*Banks*, *supra*, 61 Cal.4th at p. 803); what matters is the totality of the considerations (*Scoggins*, *supra*, 9 Cal.5th at p. 677). The considerations are: (1) "Did the defendant use or know that a gun would be used during the [underlying] felony," and, relatedly, "[h]ow many weapons were ultimately used?"; (2) "Was the defendant physically present at the crime," such that he had "the opportunity to restrain the crime or aid the victim?"; (3) "What was the duration of the interaction between the perpetrators of the [underlying] felony and the victims?"; (4) "What was the defendant's knowledge of his . . . confederate's propensity for violence or likelihood of using lethal force?"; and (5) "What efforts did the defendant make to minimize the risks of violence during the felony?" (*Id.*, citing *Clark*, *supra*, 63 Cal.4th at pp. 618-623.)

Substantial evidence supports the finding that defendant acted with reckless indifference to human life, even when applying the heightened standard set forth in *Banks* and *Clark*. First, although defendant did not personally use the gun, he

12

knew Hernandez was armed with a gun and knew he had confirmed with Hernandez multiple times earlier in the night that he wanted Pettigrew dead. Second, defendant was present during the shooting and close to Pettigrew and the shooter. Additionally, defendant was present and heard Hernandez during the prolonged count to ten and did not try to stop or dissuade him from shooting Pettigrew. Third, the entire incident took approximately 20 minutes, most of which was spent demanding cocaine from Pettigrew before Hernandez shot him. Fourth, defendant was aware of Hernandez's combat record consisting of two tours in Iraq and the injuries he suffered, and confirmed multiple times during the night that he wanted Pettigrew killed. Fifth and finally, defendant made no effort to minimize the risk of violence; he did not tell Hernandez to leave the gun in the car; he did not tell him to put the gun away; and he did not interrupt Hernandez when Hernandez began counting to ten, which defendant knew was the precursor to shooting Pettigrew.

### C. *Defendant's arguments*

Defendant makes a variety of arguments attacking the trial court's ruling.

First, defendant argues that the trial court's order is invalid—*and* that he is automatically entitled to relief under section 1172.6—because the trial court did not at the beginning of the hearing formally receive into evidence or take judicial notice of the evidence adduced in the underlying trial proceedings. Defendant misunderstands the nature of a section 1172.6 hearing. The plain text of section 1172.6 states that "[t]he admission of evidence in the [evidentiary] hearing shall be governed by the Evidence Code, except that *the court may*

13

*consider evidence previously admitted at any prior hearing or trial that is admissible under current law . . . .*"  (§ 1172.6, subd. (d)(3), italics added.)**6**  This italicized language provides that the evidence "previously admitted at . . . trial"—which in this case indisputably includes the transcripts and trial exhibits—may be considered at the evidentiary hearing; nothing in the statute requires formal re-admission or judicial notice of that evidence during the evidentiary hearing.  We decline to create an additional procedural step obligating the trial court to utter the magic words "I re-admit this" in order to recognize evidence that is already part of the record of conviction.  That would elevate form over substance and turn section 1172.6 proceedings into a game of procedural "gotcha."

Second, defendant argues that the trial court's denial of section 1172.6 relief relied upon the theory that he was part of a conspiracy, which is improper because defendant was never charged with a conspiracy.  This argument rests on a misreading of the record.  To begin, the trial court's reference to a conspiracy was to explain its finding that defendant acted with the intent to kill and hence was still guilty of murder as a direct aider and abettor, which remains a viable theory of criminal liability for murder.  Further, the trial court's denial *also* independently rested on the finding that defendant was a major participant in

---

**6**     We accordingly reject defendant's collateral argument that the trial court erred in considering the *transcript* from recorded voicemails rather than the tapes themselves.  The transcripts were admitted as an exhibit.  Even if they were not, and even if the tapes themselves (rather than the transcripts) were admitted, this would be prejudicial only if there is some evidence that the transcripts did not accurately reflect the tapes' content, and no such evidence exists.

14

the underlying attempted robbery and burglary and acted with reckless indifference to human life.

Third, defendant registers his disagreement with the trial court's analysis, accusing the trial court of "cherry pick[ing] a handful of citations" and attacking Hernandez's testimony as wholly unbelievable due to its internal inconsistencies. The trial court's analysis cited *Banks* and *Clark*—the two central cases to its primary ruling; as such, they are precisely the types of cases one *should* cherry pick. And it is not our role in substantial evidence review to reweigh witness credibility, so defendant's disagreement with the trial court's evaluation of Hernandez's testimony is of no moment. (*People v. Brown* (2014) 59 Cal.4th 86, 106.) For the first time in his reply brief, defendant also asserts that he was "substantially less culpable than" Landers or Hernandez, but, as noted above, neither the "major participant" nor "reckless indifference" requirements are defined by reference to whom in a particular case is most "culpable."

Fourth and finally, defendant at oral argument posited that defendant was too drunk to have been recklessly indifferent to the value of human life. The record does not support this argument. Although Hernandez testified that he and defendant were "drinking[ and] watching football" when Landers called them, there is no evidence that defendant was *drunk* (or otherwise incapable of being recklessly indifferent to the value of human life). Defendant's conduct during the hours immediately before confronting Pettigrew and during that confrontation support a finding that defendant was not drunk. Although Landers drove defendant's car to Pettigrew's residence, there is no evidence to suggest that it was because defendant was drunk; indeed, defendant drove just a few minutes before to pick up

Landers.

## II.   Attacks on the Trial Court

Defendant also levels several attacks at the trial court itself, including that (1) the court openly admitted that it had not re-read the *entire* transcript and instead re-read only the portion of the trial transcript important to defendant's section 1172.6 petition; (2) the court misspoke when referring to the exhibits attached to the People's opposition, and thus implied that its ruling relied on a portion of the trial transcript including counsel's closing arguments; (3) the court could not have possibly reviewed Hernandez's 200 pages of testimony during the lunch break, and because no one admitted that transcript into the record from the hearing, there is no way to prove that the trial court was not lying when it said it reviewed that transcript; and (4) the trial court's factual findings in denying his petition "read like what they were: a quickly slapped together justification of an order . . . that was not based on a thorough and reasoned consideration of the facts as they specifically related to [defendant]."[7]

---

[7]     Although defendant does not provide any reasoned argument on appeal on these issues, defendant also chastises the trial court for (1) not allowing him to call a psychologist relevant to show that he lacked the capacity to act with reckless indifference to human life; (2) not allowing him to call Hernandez as a witness during the hearing; and (3) not allowing him to call the prosecutor as a witness at the hearing.  The trial court rejected each of these arguments, finding that (1) defendant had not requested the appointment of a psychologist until the date of the hearing, which was untimely, and did not request a continuance of the hearing to arrange for the psychologist to be present; (2) defendant had not taken the appropriate procedural steps to ensure that Hernandez (who was in custody) was

16

We reject these arguments.

To begin, defendant cites no support for the notion that any of these alleged missteps somehow affects our evaluation of whether substantial evidence in the record of conviction that we have also read supports the trial court's factual findings.

Further, the trial court did not misstep, and defendant's criticisms of the trial court's conduct all lack merit. First, defendant cites no law obligating a trial court to re-read every portion of every prior proceeding in a criminal case before making a ruling on a pending section 1172.6 case. The court re-read that portion of the trial transcript that *both parties* indicated was the critical portion, and relied on counsel to accurately represent the other portions of the transcript not implicated in defendant's petition. To demand that a court spend days and days re-reading portions of the proceedings that both parties agree are not germane to a pending motion is to demand that courts waste finite and valuable time, and ignore the parties' own representations to the court in this case. Second, defendant's highlighting of the court's misstatement proves nothing more than that the court misspoke; the court's recitation of facts in support of its ruling all come from the evidence itself, even if that evidence was repeated in the parties' closing arguments at trial. Third, we decline defendant's invitation to presume that trial courts do not discharge their judicial duties and then lie to cover up their nonfeasance. The law is to the contrary. (Evid. Code, §

_____

brought to court, and instead merely chatted with the court clerk, and then made the "tactical" decision not to request a continuance of the hearing to secure Hernandez's presence; and (3) defendant's proffer as to what testimony the prosecutor would provide indicated only a "fishing expedition." We perceive no error with these rulings.

664.) What is more, we *know* that the trial court actually read the transcript because it cited numerous portions of Hernandez's testimony and referenced exhibits that do not appear in the parties' summaries of that testimony. Fourth, defendant's unprofessional and petty characterization of the trial court's findings as "quickly slapped together" overlooks that those findings track the *Banks* and *Clark* factors, which are the salient points necessary for a "thorough and reasoned consideration" of the issues defendant's petition presents.

## III. Attacks on the Prosecutor

Defendant also levels several attacks on the prosecutor, including that he (1) incorrectly urged the trial court to rely on the factual summary from the *Landers* appellate decision, (2) improperly pressured the trial court to move forward on the hearing just because the victim's family was in court, (3) improperly resisted the subpoenas for Hernandez and himself, and (4) acted in an "arrogant" and "cavalier" manner.

We reject these arguments.

Again, and as a threshold matter, defendant cites no authority for the proposition that misconduct by the prosecutor invalidates a ruling that is supported by substantial evidence.

Further, defendant's arguments all lack merit on their own. First, because the trial court's order is supported by the evidence *in the trial transcript*, any error by the prosecutor in urging the trial court to look to the factual summary in the appellate opinion was not prejudicial. Second, the hearing went forward because *defendant* also declined to ask for a continuance. Third, Hernandez was never subject to a subpoena, and the trial court denied defendant's request to call the prosecutor because defendant failed to make a proffer that amounted to more than a

18

"fishing expedition"; that the prosecutor moved to quash the subpoena against him orally (rather than in writing) is accordingly of no moment.  Lastly, we have reviewed the hearing transcript and do not see evidence of the prosecutor being either "arrogant" or "cavalier"; but even if there were, at no point did the prosecutor—unlike defense counsel—cross the line into unprofessionalism.

## DISPOSITION

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
CHAVEZ

19